## TOM THOMAS v. STATE.

No. A-2718.	Opinion Filed May 19, 1917.

(164 Pac. 995.)

1.	**APPEAL AND ERROR—Verdict on Conflicting Evidence—Conclusiveness.** The jury is the exclusive judge of the weight of the evidence and credit to be given to the witnesses. Where there is a direct conflict in the evidence, or it is such that different inferences may be properly drawn from it, the jury's determination will not be interfered with upon the ground that the evidence is insufficient to sustain a conviction, where there is competent evidence from which the jury could rationally conclude that the appellant was guilty.

2.	**HOMICIDE—Evidence—Dying Declaration.** The deceased, as part of his dying declaration, made the statement, "Those negroes shot and robbed me." **Held,** that such statement was admissible in a dying declaration.

3. **TRIAL—Requested Instruction.** Where an instruction requested by the defendant is not in proper form, but pertains to a material issue in the case, made by the evidence, the court should give a correct instruction, if he has not otherwise instructed upon that issue. After such request, it is error for the court to refuse to instruct upon such issue.

4. **EVIDENCE—Contradictory Statements by Codefendant.** Contradictory statements made by a codefendant after the commission of the crime, not shown to have been made in the presence or hearing of the defendant being separately tried, are in no sense original evidence against the latter. Where such statements relate to material matters and proper foundation is laid, they may be shown and may be considered by the jury only for the purpose of affecting the credibility of the witness making them. And when requested it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendant, but only for the purpose of affecting the credibility of the witness. Refusal of the court to instruct upon this issue after such request is error.

5. **NEW TRIAL—Grounds—Receiving Evidence Out of Court—Statute.** Where evidence introduced at the trial consists in part of the testimony of witnesses given at the preliminary examination and reduced to writing, and such evidence is attached to other written evidence of witnesses examined at the preliminary examination and not produced at the trial, and after retiring to deliberate upon its verdict the jury makes a demand for that portion of such evidence introduced at the trial, the court should see that such evidence is detached from that not introduced before permitting the jury to have it. Where this is not done, and the jury is permitted to have access to that evidence given at the preliminary examination not introduced at the trial, and such evidence is damaging to the defendant, the substantial rights of the defendant have not been properly safeguarded. It is a ground for new trial for the jury to receive evidence out of court other than that resulting from a view of the premises. Section 5937, Rev. Laws 1910.

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Tom Thomas was convicted of murder, and sentenced to imprisonment for life, and brings error. Reversed and remanded.

Tom Thomas was convicted in the district court of
Seminole county for murdering one George Gammill, and
his punishment fixed at imprisonment in the state peni-
tentiary for life. The alleged offense occurred on the 7th
day of February, 1915; this defendant being informed
against in conjunction with John Cudjo, Robert Cudjo,.
George Cudjo, all three of whom were cousins of his, and
Jim Thomas, a brother of his. The killing occurred at
night on a public highway close to the home of this de-
fendant, and in the Little River country of Seminole
county. The facts and cicrumstances surrounding the
homicide are about as follows:

George Gammill, the deceased, and Claude Allen, his
brother-in-law, at whose home the deceased was staying
at the time, lived about five miles from the place of the
killing. It appears that on Sunday morning, February
7, 1915, the deceased came to Allen's house with a suit-
case full of whisky, and stayed there with Allen and his
family until about 4 o'clock in the afternoon, when Gam-
mill suggested that they go down in the Thomas neigh-
borhood, and try to sell some of the whisky. They
started out afoot, and reached the home of Abe Thomas,.
the father of Jim and Tom Thomas, about 7 or 8 o'clock
at night. It was then dark, and Gammill stood at the
gate and hallooed. Jim Thomas came to the door and
Gammill asked him if he wanted to buy some whisky.
He answered, "Yes," and asked them to come into the
house. Gammill and his companion, Allen, then went
into the south room of the Thomas house, carrying the
suitcase of whisky. In a very short time Tom Thomas
came in and shortly after Tom Thomas arrived the three
Cudjos came. The Thomases and Cudjos were all ne-
groes. Gammill and Allen were white men. They sat

around in the room for a few minutes, and Gammill and Allen took the suitcase of whisky out into the yard. Jim Thomas followed them, and wanted a bottle of whisky. Gammill produced a quart bottle of whisky from the suitcase, and Jim Thomas took it, but did not pay for it, and when requested to pay promised Gammill that he would pay him for the whisky before he broke the bottle. Tom Thomas came out into the yard, and also wanted a bottle of whisky, which Gammill produced from the suitcase; but Tom Thomas also did not pay for the whisky, and made the same promise to Gammill that his brother Jim had made. A short time thereafter Robert Cudjo came out of the house and wanted a bottle of whisky, but by this time Gammill had become suspicious, and requested Cudjo to produce the money for the whisky before he would give it to him. Cudjo apparently did not have any money, and became somewhat incensed, at this time pulling a quart bottle out of his pocket, which bottle was about half full of whisky, and remarking to Gammill, with an oath, "that he didn't care, he had whisky any way." Immediately thereafter these three negroes gathered together and began whispering to each other, but what was said by them could not be understood by Allen and Gammill. Allen then suggested to Gammill that they had better get away, they would likely have trouble, and Gammill said that he would go back into the house, and did so. Allen picked up the suitcase of whisky, and went out in the yard near the fence. In a short time Gammill again came out to Allen, but again returned to the house to collect for the whisky. At this time Allen took the grip of whisky, and started south from the Abe Thomas home down the road in the direction of where Tom Thomas

lived, which was about 100 yards southwest of Abe Thomas' residence. Allen proceeded down the road a distance of about 100 yards, and stopped in the road. In a short time Jim Thomas and George Gammill came down to where Allen was, and stopped a short distance, five or ten steps south of Allen. Immediately thereafter three negroes came up behind Allen, and stopped about five steps north of him. Gammill and Jim Thomas were whispering to each other, and immediately Jim Thomas called Tom Thomas, who apparently was not among the negroes present at that time. Allen says that when he started down the road south with the suitcase of whisky he saw somebody running down the road ahead of him, but did not know who it was. After Jim Thomas called for Tom Thomas some negro came out to the road to where these parties were standing, and came up to Claude Allen with a drawn pistol in his hand, and pointing it at Allen, picked up the suitcase of whisky and started to back away to the north with it. At this time Allen called to Gammill, who faced around, and thereupon the negro with the pistol fired a shot at Gammill. Gammill dropped to his knees and pulled a revolver, and returned the fire four or five times. After the shooting all the negroes had disappeared; also the whisky could not be found. Allen says that the person who came up with the revolver and fired the shot to the best of his knowledge was Tom Thomas, and that the three negroes who came down and stood behind him were the Cudjo negroes. This shooting occurred about 10 o'clock at night. Gammill lived until 8 o'clock the next evening. Before his death he made some dying statements, in one of which he said that he believed "Tom Thomas shot him; that it was either Tom Thomas or John Cudjo; that those negroes had shot him

and robbed him." After the shooting all of these negroes gathered at the house of Gibson Payne, another negro, who was distantly related to them. None of them lived at Payne's residence. A deputy sheriff went to Payne's house about 11 o'clock the night of the shooting and arrested Robert Cudjo. None of the others were arrested at that time, but Jim Thomas and George Cudjo and Tom Thomas were arrested the next day. In the meantime John Cudjo had fled, and up to the time of the trial had never been apprehended. It was the contention of the defendant that John Cudjo killed Gammill, and, while the defendant did not take the witness stand in his own behalf, he produced George Cudjo as a witness, and George swore that John was the man who did the shooting.

From the foregoing statement of facts it is apparent that it was the theory of the state that Tom Thomas shot and killed George Gammill on this occasion, or, if Tom Thomas did not fire the fatal shot, the killing was a result of a conspiracy between all of these negroes to rob George Gammill of the suitcase of whisky, and to kill him if necessary to accomplish that purpose; that all the negroes were present at the scene of the killing, and had so located themselves as to be in a position to perform their part, whatever that might be, to carry into effect the purpose of the conspiracy, when necessary. The theory of the defendant was that John Cudjo, the fugitive, killed Gammill, and that the evidence on the part of the state to prove a conspiracy was insufficient to connect this defendant with it.

*Orwig & Moore*, for plaintiff in error.

*S. P. Freeling*, Atty. Gen., and *R. McMillan*, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is first contended that the court erred in refusing to direct the jury to return a verdict of not guilty for the reason that the state failed to make out a case against this defendant by sufficient evidence. It is not necessary to enter into a lengthy discussion of the merits of this contention. The foregoing statement of facts, to our mind, discloses evidence sufficient, if believed, to authorize the jury to convict this defendant either upon the theory that Tom Thomas himself fired the fatal shot, or upon the other theory that he was a coconspirator with the one who did kill Gammell and as such aided and abetted in the killing. The rule is well established in this jurisdiction that the weight of the evidence is for the jury, and where there is any evidence in the record which, if believed, is sufficient to authorize a conviction under the law this court will not disturb the judgment because of insufficient or conflicting evidence. It is true that this is a murder case, and the penalty imposed is severe; but the province of an appellate court is to determine questions of law and to establish principles of law by which fair and impartial trials may be had. It is just as essential that courts abstain from invading the province of the jury as it is essential that the jury be guided by the law as given by the court. In no other way can justice be fairly administered. If trial and appellate courts were constantly invading the province of juries in this state, the jury system would become a farce and of no protection whatever to the accused. It is only in cases where this court can say, as a matter of law, that there is no competent evidence supporting the charge, that the judgment of conviction will be reversed.

There is evidence in the record fully sufficient to authorize the jury to conclude that the appellant was guilty. Our investigation need go no further, except to determine whether or not the jury was influenced by improper motives in reaching a verdict. *Bishop v. State,* 9 Okla. Cr. 175, 130 Pac. 1173; *Maggard v. State,* 9 Okla. Cr. 236, 131 Pac. 549; *Caple v. State,* 3 Okla. Cr. 621, 105 Pac. 681.

It is also contended that the court erred in admitting incompetent, irrelevant, immaterial, and hearsay evidence offered by the state and duly excepted to at the time, which evidence the defendant requested the court to instruct the jury not to consider, which request was by the court denied, and to which ruling of the court the defendant at the time excepted. This assignment of error relates to certain testimony of one Ed Weisman, a deputy sheriff, who was introduced by the state in rebuttal. It was attempted to be shown by Weisman that the defendant's witness George Cudjo had made certain statements to Weisman at the time of his arrest contradictory to his testimony upon the witness stand, and at the time Weisman was first called to testify the court sustained the objection of defendant's counsel to this testimony on the ground that proper foundation had not been laid for its admission. Thereafter the court permitted the state to place the witness George Cudjo upon the witness stand for further cross-examination, and the state did lay the proper foundation for impeaching Cudjo by Weisman. So that the only question left to be determined is whether or not the statements alleged to have been made were material. George Cudjo in his direct examination testified that John Cudjo, his half-brother, fired the fatal shot that killed Gammill; that he was close to him, and saw

the shot fired, and recognized his brother John at the time. For purposes of impeachment he was asked if he did not state to Weisman, in substance, at the time that Weisman arrested him, the following: "I don't know who did the shooting of that boy up there. I did not know anything about that shooting up there, or did not know anybody was shot." He was also asked if at any time the night of his arrest or the next day he told Ed Weisman that John Cudjo did the shooting. It requires no argument to convince a person of ordinary intelligence that this evidence was material. Cudjo at the time of his arrest stated that he did not know who did the killing. At the time of the trial he stated positively that John Cudjo did the killing. It was a material inquiry, according to the theory of the defendant, as to who fired the fatal shot, and it became relevant, therefore, for the state to contradict the only witness who took the stand for the defendant and testified that John Cudjo fired the shot. Counsel for defendant concede that a witness may be impeached by evidence tending to show contradictory statements on material matters, but contend that this evidence was immaterial. With this contention we firmly disagree. It was material to prove that either the defendant or one of his codefendants fired the fatal shot, and where a witness makes contradictory statements as to that fact he may be impeached by showing the same. It is not necessary to cite authorities in support of this principle which has been repeatedly recognized by this court.

It is also contended that the statement made by the witness George Cudjo, and upon which he was impeached, to wit, "I am going to Wewoka for a long long time," addressing his remarks to the people at Gibson Payne's home, at the time of his arrest, was immaterial. We

think that it was proper to contradict this witness by showing that he made this statement, which he denied. It tended to discredit him, and was material in disclosing a state of mind on his part at the time of his arrest, shortly after the homicide, which indicated his connection with the homicide and knowledge of its commission, indicating that he was concerned in the conspiracy that resulted in the death of Gammill, and understood why he was being arrested. The defendant had produced this witness, who testified to a state of facts which indicated that neither he nor the defendant was in any way connected with the killing, or had any knowledge that Gammill was to be robbed at that time. It certainly tended to discredit the testimony that he had given to that effect, and for that reason, in our opinion, it was sufficiently material for impeachment purposes.

But the serious question in connection with this evidence is the refusal of the trial court to instruct the jury to limit its consideration of same solely as tending to impeach the witness George Cudjo. Counsel for defendant did not request an instruction directly covering this matter, but did request the court to give the following instruction:

"You are instructed that the state has wholly failed to prove that a conspiracy existed, and in this connection you are instructed not to consider any statements of witnesses, except for the purposes of impeachment of other witnesses, concerning what was said or done, unless the defendant were personally present and heard what was said. And you are further instructed in this connection, a conspiracy not having been proved by the state, that before you can find the defendant guilty you must find beyond a reasonable doubt that he fired the shot that took the life of George Gammill, the deceased."

Said instruction was properly refused because of reasons heretofore given, to the effect that there was evidence before the jury sufficient to submit the question of conspiracy.

But that portion of said instruction which reads, "and in this connection you are instructed not to consider any statements of witnesses, except for the purpose of impeachment of other witnesses; concerning what was said or done, unless the defendant were personally present and heard what was said," certainly directed the court's attention to this impeaching evidence sufficiently to require the court to give a proper instruction covering the purpose for which it should be considered by the jury. This the court entirely failed to do.

It has been held that "where an instruction * * * is not in proper form, but pertains to a material issue in the case as made by the evidence, the court should correct it and give it in proper form, if he has not otherwise instructed upon that issue; and after such request it is error for him to fail or refuse to give an instruction upon such issue." Roberson v. United States, 4 Okla. Cr. 337, 111 Pac. 984; McIntosh v. State, 8 Okla. Cr. 469, 128 Pac. 735; Morris v. Terr, 1 Okla. Cr. 619, 99 Pac. 760, 101 Pac. 111; Fairgrieve v. State, 10 Okla. Cr. 109, 134 Pac. 837. It was the duty of the court, after this request, to instruct the jury that such contradictory statements could only be considered by them for the purpose of affecting the credibility of the witness George Cudjo, and for no other purpose. These contradictory statements by George Cudjo were in no sense original evidence against this defendant, but the jury was left open to consider them for any purpose it might have

seen fit. This was error, and especially prejudicial to the defendant in this case because his entire defense was based upon the testimony of this witness.

In *Sturgis v. State*, 2 Okla. Cr. 362, 102 Pac. 57, this court held:

"When contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, they must be confined to contradictions of the testimony of the witness which are injurious to the party seeking to impeach him, and it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent, substantive evidence against or in favor of the defendant, and that the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if they decide that such statements do have this effect, and that it is unlawful for the jury to consider such statements for any other purpose."

The refusal of the trial court to instruct the jury on the purpose for which alone this testimony was receivable requires a reversal of this judgment.

Other matters are urged in the brief of counsel for defendant in error which appear to be well grounded, especially that the jury was permitted to have access to certain testimony, given at the preliminary examination, of witnesses who were not examined on the trial. It appears that the entire transcript of the testimony given at the preliminary examination was upon request allowed to be taken to the jury room for the purpose of permitting the jury to read certain portions of such evidence introduced upon the trial both as original and impeaching evidence. While it is not clearly shown that the jury considered or read any of this evidence except such as was introduced upon the trial of this case, it is clearly

evident that the opportunity to receive and examine other evidence than that received in court was afforded. This should not be permitted under any circumstances.

The second subdivision of section 5937, Rev. Laws 1910, makes it ground for new trial for the jury to receive evidence out of court other than that resulting from a view of the premises. Sections 5912 and 5913, Rev. Laws 1910, provide:

"On retiring for deliberation the jury may take with them the written instructions given by the court, the forms of verdict approved by the court, and all papers which have been received as evidence in the cause, except that they shall not take copies of such parts of public records or private documents as ought not, in the opinion of the court, to be taken from the person having them in possession."

"After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the county attorney and the defendant or his counsel, or after they have been called."

Had there been a disagreement between jurors as to any testimony introduced other than the documentary evidence, the jury should have been returned into court and the evidence read to them. And where the evidence is written or documentary, and is attached to other such evidence not introduced on the trial, it should be detached from that not introduced before the jury is permitted to take the same to the jury room. The foregoing statutes should be strictly complied with, as it is a substantial

right of the defendant to have the jury kept free from any improper influences while considering its verdict as well as during the entire progress of the trial.

Another matter which is complained of, and will, in all probability, likely arise on a retrial of this charge, is that the court erred in admitting that part of the dying declaration of Gammill in which he said, "Those negroes shot me and robbed me." It is contended that this evidence should have been excluded because it was nothing more than the opinion of the deceased, and the deceased, if living, would not have been permitted to testify to such effect. There seem to be two rules upon this question: First, the strict rule which is followed by some courts to the effect that it is indispensable that the dying declaration should consist solely of facts, and not of conclusions or opinions; and, second, the liberal one that opinion rule is not necessarily applicable to dying declarations.

The latter rule is pointed out by this court in the case of *Blair v. State*, 4 Okla. Cr. 359, 111 Pac. 1003. The doctrine is well established in this state that matters like this should be construed liberally. This rule is laid down by Prof. Wigmore in his work on Evidence, sec. 1447, as follows:

"The opinion rule has no application to dying declarations. The theory of that rule *(post,* sec. 1918) is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his infer-

ences are not in this instance superfluous, but are indispensable."

Numerous cases are cited in the note to this section which disclose that expressions very similar to the one here made by the deceased have been admitted, such as the following:

"He cut me for nothing." "He killed me for nothing." "I know that one of the two shot me." "You have killed me without cause." "They have murdered me." "He shot me down like a dog," etc.

—all of which contain certain expressions of opinion and conclusion on the part of the deceased. Applying the liberal rule, therefore, which we hold to govern in this state, it is our opinion that the statement aforesaid made by the deceased in his dying declaration was admissible.

The contention that because whisky is contraband property in this state, as against the state and its officers, others are entitled to rob and murder in order to obtain possession of it from one who is using it unlawfully is wholly without merit. Neither robbery nor murder may be justified or excused on such a ground.

For the reasons given the judgment of conviction is reversed and the cause remanded. The warden of the state penitentiary is instructed to surrender the defendant to the custody of the sheriff of Seminole county upon proper demand at said penitentiary.

DOYLE, P. J., and ARMSTRONG, J., concur.