## LEE EYLAR v. STATE.

No. A-4428.   Opinion Filed July 14, 1924.
(227 Pac. 897.)

(Syllabus.)

**Trial—Witnesses—Scope of Impeaching Testimony of State's Own Witness—Necessary Instruction.** Where the trial court permits the prosecuting officer, upon the ground of surprise, to impeach the state's chief witness by showing contradictory testimony given by him at the preliminary examination, the impeachment of such witness should be limited to a contradiction of the material testimony, given at the trial, which is injurious to the state. The trial court, under such circumstances, should positively instruct the jury that none of the contradictory statements made at the preliminary trial may be considered as substantive evidence of guilt.

Appeal from District Court, Pittsburg County; John L. Norman, Special Judge.

Lee Eylar was convicted of the larceny of an automobile, and he appeals. Reversed and remanded.

R. W. Higgins and Cad Mathis, for plaintiff in error.

The Attorney General and J. Roy Orr, Asst. Atty. Gen., for the State.

BESSEY, J.   Plaintiff in error, Lee Eylar, defendant in the trial court, was by a verdict of a jury rendered February 11, 1922, found guilty of the theft of an automobile, and the court, rendering judgment on the verdict, fixed his punishment at confinement in the penitentiary for a term of seven years. The defendant says that the evidence is insufficient to support the verdict; that the verdict is based on evidence vital portions of which were incompetent and erroneously admitted, tending to arouse the passions and prejudices of the jury; and that the court failed to define or instruct upon certain issues of law raised by the evidence.

The evidence implicating the defendant was largely circumstantial. It will serve no good purpose to fully describe

the plot and all the things done by those who participated in its commission. The deductions based on the evidence as it appears in the record are these: That the defendant is a versatile individual, who has been engaged in numerous and varied occupations. At different times he has been a farmer, a telephone operator, a newspaper editor, a minister of the gospel, and more recently a lawyer. The county attorney insisted at the trial that he was also an automobile thief and a paramour—a situation well set to arouse the suspicions of the jury and divert their minds from the main issues in the case.

Charley Morris, the chief witness for the state, a young man 20 years of age and by trade an automobile mechanic, was arrested as a joint participant in the automobile theft. At the preliminary trial Morris testified that the defendant owned two old Ford cars and that he had been employed in making repairs on both of these cars; that at the request of Eylar, the defendant, Morris, and Harry Young went in the nighttime to where the stolen car was hidden in an isolated place and took from the stolen car the radiator, timer, tires, and other parts and placed them on one of the defendant's cars. At the trial in district court Morris repudiated his story told at the preliminary and told a different story, exonerating the defendant. This state's witness explained that he had testified as he did at the preliminary examination for his own protection; that Jim Roberts, a deputy sheriff, had threatened to send him to the penitentiary if he would not by his testimony help send Eylar to the penitentiary. Quoting from the testimony of Morris at the final trial:

"A. He [Jim Roberts] told me that he had found out that Mr. Eylar stole Mr. Marlow's car and he knew all about it, and that if I didn't help send Lee Eylar to the penitentiary he would send me; and he later on said if he hadn't told me what he did, he had already made up his mind to arrest me

and throw me in for it, and he told me down by the Doss House there that Mr. Eylar told Mr. Marlow that for $25 he would prove that I stole his automobile. That was Mr. Eylar's statement to Mr. Marlow; Jim Roberts told me that Mr. Eylar told Mr. Marlow that.

"Q. Then did he make you believe that if you didn't tell a story connecting Lee Eylar with the theft of that automobile that he would put you in prison? A. Yes, sir.

"Q. Is that the reason that you stated at the preliminary that Lee Eylar was connected with the theft of that car? A. Yes, sir.

"Q. Now, do you know—did Mr. Eylar have anything to do, so far as you know, with the stealing of this man's car down there? A. No, sir; he had nothing to do with the stealing of it.

"Q. And you took those parts off of the Eylar car and Harry Young took them away? A. Yes, sir; Harry made away with them; I don't know what become of them.

"Q. I will ask you if you know whether or not, at that time, Lee Eylar knew that you boys were going to do that? A. I don't know, unless him and Harry knew about it.

"Q. Did he ever tell you to do it? A. No, sir; he never did tell me to do it.

"Q. So far then as you are concerned, and so far as your knowledge of this matter goes, Lee Eylar knew nothing of that car being stolen, whatever, did he? A. No, sir.

"Witness: I have a statement I would like to make to the jury, Mr. Whitt, if it will be all right with you.

"Mr. Whitt (County Attorney): What is it?

"A. A statement I would like to make. Mr. Eylar came to me here a day or two ago and asked me what I was going to swear to in this case and I told him I wasn't going to swear to anything but the truth and I didn't care who it

hurt; if it hurt him it would hurt him; and if it hurt me it would hurt me. I told him I would swear to the facts in this case, and I have done my part of it.''

None of the parts taken from the stolen car could be identified as being those replaced on the defendant's car, except that some witnesses said that the Firestone tires on one of the defendant's cars looked like those that were on the stolen car. One of these tires had a short cut in the tread and the owner of the stolen car said that that was the condition of one of his tires.

It will be seen that the state impeached its own chief witness and offered no other witness to prove that the story told him at the preliminary was true, rather than the story told by him at the final trial.

The court did not instruct the jury that the testimony taken at the preliminary trial could be considered only for purposes of impeachment and that it could not be considered by the jury as substantive proof of the truth of the facts testified to by the witness at the preliminary trial. This being the case, it is fair to assume that the jury believed it was incumbent upon them to decide which of the two stories was the true one, and by their verdict it appears that they did decide that this witness told the truth at the preliminary trial and that the story told at the final trial was false.

In the case of Thomas v. State, 13 Okla. Cr. 414, 164 Pac. 995, the court said:

"Contradictory statements made by a codefendant after the commission of the crime, not shown to have been made in the presence * * * of the defendant being separately tried, are in no sense original evidence against the latter. Where such statements relate to material matters and proper foundation is laid, they may be shown and may be considered by the jury only for the purpose of affecting the credibility of the

witness making them. And when requested it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendant, but only for the purpose of affecting the credibility of the witness. Refusal of the court to instruct upon this issue after such request is error."

In the case of Broshears v. State, 17 Okla. Cr. 192, 187 Pac. 254, the court said:

"Where the trial court permits the prosecuting officer, upon the ground of surprise, to impeach a state's witness by showing contradictory testimony given at the preliminary examination, the impeachment of such witness should be limited only to a contradiction of the material testimony given at the trial which is injurious to the state, and such matters should be called specifically to the attention of the witness. The trial court, under such circumstances, should positively instruct the jury that none of the contradictory statements may be considered as substantive evidence of guilt. Before impeaching evidence of this kind is permitted to be introduced, there should be a clear showing of surprise on the part of the state."

Other cases to the same effect are Sturgis v. State, 2 Okla. Cr. 362, 102 Pac. 57; Culpepper v. State, 4 Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668.

Ordinarily, where an incidental issue of law is involved and no request is made for an instruction on that point and none is given on the court's own motion, the aggrieved party cannot insist upon that omission for the first time on appeal; but where the omission of an instruction on impeaching evidence is an omission upon the main issue in the case the rule should not apply.

In the Thomas Case, supra, a request was made for a proper instruction on the purpose for which the impeaching

proof should be considered. While no such instruction was requested here, the most vital question in the case was the admissibility of the statement made by this witness at the preliminary trial as substantive evidence and not merely for purposes of impeachment. Under circumstances like these, where the case stands or falls upon a single question of law clearly raised by the evidence, the court should declare the law on that point whether requested to do so or not, and particularly where, as in this case, an objection was made to the introduction of the record of the former testimony of the state's chief witness. Section 2722, Comp. Stat. 1921. Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375; Gray v. State, 7 Okla. Cr. 102, 122 Pac. 265.

The testimony of Morris at the preliminary trial could not be considered as substantive proof implicating the defendant, but only as affecting his credibility; the other testimony adduced by the state, and the only competent testimony for the consideration of the jury, was fragmentary and insufficient to establish the defendant's guilt, or to point strongly to such guilt, amounting to nothing more than a surmise of suspicion—circumstances not inconsistent with innocence.

The defendant was asked on cross-examination if he did not frequently go to a certain farm, a resort for thieves, and whether his relations with a certain woman there were not improper. This the defendant denied, and there was no proof or evidence offered establishing the truth of these accusations.

The judgment of the trial court is reversed and the cause remanded for a new trial.

MATSON, P. J., and DOYLE, J., concur.