## WARD v. STATE.

No. A-11384. Sept. 6, 1950.

(222 P. 2d 173.)

144

Herbert K. Hyde, Earl E. James, and Lee Williams, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The plaintiff in error, Clay Wallace Ward, hereinafter referred to as defendant, was convicted in the district court of Oklahoma county of burglary in second degree and sentenced to be confined in the State Penitentiary for a term of two years.  Appeal has been duly perfected to this court.

Counsel for defendant advance two propositions for reversal:

"(1) There was no corpus delicti established and no corroboration of defendant's alleged extra-judicial confession.

"(2) Error in permitting impeachment and cross-examination by the State of its own witness Sipes."

Considering the specifications in the order advanced, we find that counsel for defendant interposed a demurrer to the state's evidence and a motion for a directed verdict upon the grounds set out in their first proposition. Under our statutory provision, the responsibility rested on the trial court, in the first instance, to determine whether or not a sufficient amount of legal and competent evidence was adduced to allow the case to be submitted to the jury, and now this court must determine whether the verdict rendered is contrary to law or evidence. 22 O.S.A. § 952.

Counsel for defendant contend:

"It is noted at once that not one witness connected the defendant Ward with the commission of this alleged burglary, and that the only evidence that tends to connect him with it is the testimony of the officers to the effect that he himself made an extra-judicial confession. Therefore, 1. There was no corpus delicti established, and no corroboration of defendant's alleged extra-judicial confession."

The legal question then, is: Where a prisoner voluntarily, and without threats or promises, confesses to the commission of a crime, what is necessary additionally, if anything, to support a conviction?

The answer is simply that there must be independent proof of the corpus delicti, or in plain English, the actual commission by someone of the particular offense charged, and it may be established without showing that the offense in question was committed by the accused, and it may be established by circumstantial evidence. And where the actual commission of the offense is established by independent evidence, then a conviction based upon the defendant's voluntary confession is warranted. Gorum v. State, 60 Okla. Cr. 248, 63 P. 2d 765; Hopkins v. State,

75 Okla. Cr. 268, 130 P. 2d 543; and Long v. State, 77 Okla. Cr. 174, 140 P. 2d 600. Thus, it is not necessary that the confession be otherwise corroborated.

We have carefully examined some ten cases cited by the defendant and many of them are referred to in the above cases, and none are in conflict with the principles of law above set out. In one, the evidentiary situation was very close, and in application of the law could give defendant comfort. However, in this jurisdiction the law confirmed above has long been well settled, and the problem is merely the application of the law to the facts.

The factual inquiry, then, in this case, is whether or not the state met its burden of establishing the crime charged (which was the breaking and entering by someone on March 21, 1949, of the Lieberman Produce Building located at 315 East Grand, Oklahoma City, and the taking of six and one-half crates of eggs and three chickens) by means other than the defendant's confession, and did the defendant actually confess?

The record discloses that Henry Fine testified for the state, that he was part owner of the Lieberman Produce Company, 315 East Grand, Oklahoma City; that his firm handled poultry and eggs and that they processed poultry and graded eggs and kept certain delivery trucks in the same building, and that various rooms were all accessible from any part of the inside. He testified that on March 21, 1949, they had on hand a quantity of processed poultry in an open tank and in the back room and ready to be shipped out the following morning; that they also had cases of eggs in the warehouse room, thirty dozen eggs to a case and valued at $12 to $15 per case. Witness further testified that entrance by truck was made to the building by a front overhead door that could be locked

from inside or outside; that there was a back door that was locked from the inside; that entrance to the building was made through the outside office door; that they had a nightwatchman who tried the doors after work hours; that on the night of March 21st they had one truck in the building; that witness opened at 5:30 the morning of March 22nd, and when he walked into the office he noticed papers scattered over the floor, waste paper basket upset, the safe open and part of the contents on the floor; that he immediately 'phoned the police and two officers responded; and that further investigation was made. Mr. Lieberman's private cabinet had been smashed in at one end and eleven bottles of sacramental brandy used in religious services had been removed and could not be found, except a half empty bottle was found in one of the toilets and someone had vomited all over the floor.

Next it was discovered that someone had removed a 2' x 4' glass panel from a large skylight; that there were wooden beams under the skylight and also a post on which a water hose had hung, but had been removed and tied to a beam underneath the skylight. No doors were found open, but only the hole in the skylight. Witness further testified that at 6 a. m. his crew of workers arrived for the day's work and that he sent one worker to get the crated eggs for delivery and it was found that fourteen crates of eggs were missing; that he was unable to tell whether any of the processed chickens were missing from the tank or not because if any were taken the number was so few as to not be noticeable. He found their Ford 1946 pick-up missing and later the same day the police found it abandoned in the 200 or 300 block on South Broadway, and he got the vehicle back that afternoon.

Jack L. Mullenix, police officer, Oklahoma City, testified that on the morning of March 22nd, at about 6 o'clock, he and Officer Jordan were cruising their district and they answered a burglary call and went to the Lieberman Produce Company in his district, and he described the office, safe, cabinet, littered floors, and skylight substantially as testified to by witness Fine.

Officer Jordan also corroborated witnesses Fine and Mullenix, and also testified that he questioned Mr. Fine and got a report, and he stated:

"I also went up on top to see how they had removed the glass, which has little tin things, and all you have to do is pick them up with your fingers and pull a little strap off there, I think there was three or four of them on there, and you can slide the glass out."

He stated that he climbed to the roof and there was room for a man to climb down into the building through the opening where the glass had been removed from the skylight.

By the above evidence we conclude that the state did meet the burden of showing the actual commission by someone of the offense charged; that is, that the building in question had been forcibly entered from the outside and burglarized. This was undisputed. So that if the defendant confessed to the crime charged, then the requirements of the law necessary to support a verdict of guilty were met, unless of course a reversal would be required on other grounds.

Bert Giddens, Oklahoma City Police Department, testified that he and Officer Cravatt, detective, arrested the defendant soon after the burglary in question, finding him at the Nesbitt Bottling Works, Oklahoma City, where he had worked for one day. He testified that he and other

officers had made a very thorough and carfeul investigation regarding the burglary of the Lieberman Produce at 315 East Grand, and that prior to filing of charges that he talked to the defendant in the stolen goods department of the detective bureau. He stated that he had talked to a Mr. Sipes, witness in this case for the state, and being the person admittedly purchasing part of the stolen eggs and paying codefendant Mace Mullins, and had talked to Ward; that Ward was the first person to tell them about breaking into the place, but he had required them to get prisoner Mullins and bring him in and he and defendant Ward talked among themselves. Witness further testified:

"A. Ward told us that they had gone down there, and they had been drinking, and that he thought that the time was a little after dark, he wasn't sure as to the exact time, and that they had went in through the skylight, and they had gone in there and looked around the place, and had taken some eggs and chickens out of the place. But before they did that, he also told us that they had drank some of this wine that was in there, and we learned later that it was this Pass-over wine, and they got very ill on it, in fact, they got sick, and he vomited all over the place, or at least, I believe it was in the rest room, after they had obtained it from the office. Q. Did he relate that to you? A. Yes, sir, he did. Q. This defendant? A. Yes, sir. Q. Was the other defendant present also? A. Yes, sir. Q. Go ahead. A. Well then, after Ward had told us about it, then we put them both— Q. (Interrupting) What else did Ward tell you. did he tell you anything further than that? A. Yes, sir; he also told us that after they had gotten the chickens, rather the eggs and the chickens and loaded them onto the truck, they drove out to Sipes' place, which was located out on 29th Street in the 900 block, 904, I believe, and they had sold the eggs. I don't know how many chickens they had, he said he wasn't sure, he didn't know how many chickens they had, but he had sold these eggs

to Sipes, or rather that Mace Mullins had, and after that, they had drank some more out there, and that they later went down and left the truck in the 200 block on South Broadway, that they used in hauling the eggs and the chickens out on 29th Street. Q. Were both of these defendants present? A. Yes, sir. Q. And related that set of circumstances to you? A. Yes, sir. Q. That was after you made your preliminary investigation, was it? A. That's right. Q. And after their arrest and prior to filing the charges in the case? A. Yes, sir. Q. The man Ward that you have mentioned is this defendant, Clay Wallace Ward, sitting here in the court room at this time, is it? A. Yes, sir. Q. You had previously talked to Sipes, had you? A. Yes, sir. Q. And to the officers who made the original arrest? A. Yes, sir."

J. W. Casady, police officer, testified that he and Officer Giddens questioned the defendant, and defendant said:

"It looks like I am drove up. Go get Mace Mullins and we will tell you all about it. * * * Q. Where was Mullins? A. He was up in jail, up on the third floor. We got Mullins out of jail, brought him down there, and Ward and Mullins both told us about going down there and breaking in the skylight and going in the place and stealing the truck. First, when they got in there, they found some brandy, and they said it wasn't very good brandy, because it made them sick, and they threw up on the floor, and they got some eggs and some chickens and put them in the truck and went out to 904 Southeast 29th street, and they sold the eggs to a Mr. Sipes for $20, four cases of eggs. Q. Did they say anything about what they did with the truck? A. They took the truck and left it down on Washington, after they got through it."

On re-direct examination by Mr. Holbird, witness further testified:

"Q. I will ask you what was said and done on the occasion when Sipes was present? A. They admitted

in Sipes' presence that they did the burglary, and sold the eggs to Sipes, in Sipes' presence. Q. What did Sipes say about that in their presence? A. Well, he admitted buying the eggs and giving them the $20, he gave Mullins the $20 for the eggs. He did not pay this boy, he paid Mullins. Q. And that was in the presence of this man, this accused, Ward, and the accused Mullins, who was previously tried and convicted, and the witness Sipes? A. That's right."

This brings us to a consideration of defendant's contention that the court erred in permitting impeachment and cross-examination by the state of its own witness Sipes.

Although the state proved the corpus delicti as well as the confession of the defendant, which would be sufficient to support a possible conviction by the jury, yet in view of defendant's failure to plead guilty and in view of his efforts to avoid conviction in spite of such proof, it was important to know whether the defendant was in Sipes' Tavern, 904 Southeast 29th street, along with one Mace Mullins on the evening of March 21, 1949, and whether he in any way participated in the transaction whereby witness Sipes purchased four cases of eggs from Mullins and whether or not defendant offered to sell witness Sipes one or more dressed chickens, and whether or not Sipes had in police show-up identified defendant as a person who was in his place of business with defendant's alleged accomplice Mullins.

The state produced as a witness Henry Furman Sipes, hereinabove referred to, who testified that he ran a tavern at 904 Southeast 29 street, Oklahoma City, and that about 10 or 11 o'clock that night (March 21, 1949) a man by the name of Mullins (the codefendant) came in and ordered some beer and that Mullins wanted to sell witness some eggs and witness agreed to buy, and Mullins went

out to the back and when witness went back there were four cases of eggs on the floor and Mullins wanted $35 for them, but witness paid him only $20, and came on to the front, but that there were two or three fellows at the back and one of them had a chicken in his hand and said: "Would you buy this chicken for a dollar, dressed chicken?" Witness would not say who was in the door or who had the chicken. He was asked by the county attorney:

"Q. Did you see the defendant Ward there at that time? A. Well, he was in my place of business and around there at that time, all the time."

Witness on direct examination would not say who offered him the chicken, would not swear whether it was Mullins, Ward, or who. Witness was quite evasive and a reading of the records forces the conclusion that he was not being frank and was evading clearly answering the questions propounded. The county attorney again asked witness Sipes:

"Q. Did you see him [the defendant] in the back part? A. Well, I couldn't swear to that. Q. You couldn't swear to that? A. No, sir. I know there was three or four more at the back of the place; the last time he come in with the chicken, there was two or three fellows standing there by him."

Apparently, witness meant Mullins offered the chicken, and not the defendant. He was asked by the county attorney:

"Q. Let me ask you whether it was Mullins? A. I couldn't swear it was even him, but I know he was the one who sold me the eggs. He was at the back door, and he was in the bunch, but to remember where the other parties was, I can't."

On cross-examination by Mr. Hyde witness stated that defendant was in his place of business drinking beer

but he did not remember whether it was when Mullins was in there or not, that he did not mean to convey to the jury that Mullins and defendant came in there together or drank together or talked together or that defendant sold him a chicken or eggs.

Following this, the county attorney claimed surprise and claimed that witness had given a signed statement implicating Ward as being with Mullins when Mullins sold him the eggs and that Ward was actually the man who offered the chicken. Counsel for defendant denied that the county attorney could be surprised for the reason that Sipes in testifying at the trial of Mullins had not identified Ward as being with Mullins or implicated, and had in fact identified Mullins as the person offering the chicken. The court reporter, Hugh Gill, was called to read the testimony given previously by Sipes. This was out of the presence of the jury. Sipes had testified concerning purchasing the eggs from Mullins and also that there was someone else at the back door whom he did not know at the time, but had since learned, and he pointed out the party as then sitting in the audience and stated that he had previously identified him at the police station, and Sipes had, as claimed by counsel for defendant, identified Mullins as offering a chicken, rather than the defendant. But as to Ward's presence with Mullins, Sipes had said: "I don't know whether—I couldn't say what his name is yet, but I know him to identify him." He then pointed out someone other than Mullins, and due to the many interruptions and objections by counsel, it is not clear who was pointed out. But the evidence as a whole indicates it to have been the defendant. Thereafter, the jury was returned to the jury box and the county attorney was permitted to cross-examine his witness Sipes, who admitted to signing a written state-

ment after he had read it, as to the facts concerning his purchase of the eggs in question and the offer of a chicken by defendant, and of defendant's presence with Mullins.

While the statement was signed prior to the testimony in the Mullins case, the county attorney also claimed that he had since questioned witness just before noon that day and was led to believe that witness would stay by the signed statement in which he had identified Ward as being the man who offered to sell him the chicken, and who was present with Mullins during all the transactions in question. The court admitted in evidence the signed statement. In connection with this the court at the time orally instructed the jury:

"All right, now, gentlemen, the court is admitting into the evidence the statement given to the officers by the witness Sipes. You are instructed not to consider that part of that statement as any evidence going to the guilt or innocence of the defendant Ward, now on trial, but you are only to consider it for the purpose of impeachment as to the witness Sipes, and that alone. You must not consider it as any evidence as to the guilt or innocence of this defendant, just merely for the purpose of impeaching the witness Sipes, is all, as to whether to ignore Sipes' testimony; that is the only purpose for which this statement is admitted."

In Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838, this court held:

"Where a witness has made statements in writing, different from those made on the trial, and the statements are shown to witness, who admits having made them, and the witness is given an opportunity to explain them, the statements may be read in evidence for the purpose of impeachment."

See, also, Dunham v. State, 78 Okla. Cr. 54, 143 P. 2d 834, as well as Sturgis v. State, 2 Okla. Cr. 263, 102

P. 57, the principal case relied on by defendant. There does not seem to be any dispute as to the law involving the defendant's specification Two. Rather, it is contended that the testimony of witness Sipes was not injurious to the state, and hence witness could not be impeached. But we conclude that the court did not err, under the circumstances, in permitting the county attorney to impeach witness Sipes. His testimony, especially on cross-examination, was damaging to the state, and it was thereafter that the county attorney claimed surprise, and the cross-examination and impeachment was then permitted.

The defendant did not testify, but he offered his wife to prove an alibi, and his codefendant Mullins, who was then serving a two year sentence after conviction on the same charge. Mullins denied ever having known defendant until they both were in jail on the charge and denied that defendant in his presence had ever confessed to the officers any connection with the burglary in question. Witness stated that in order to get his wife out of jail, that he confessed to the officers, but that he was not guilty. The evidence of Sipes and the officers would support a charge of perjury against this witness.

We have carefully examined the instructions. The court gave correct instructions, covering defense by proof of an alibi, and circumstantial evidence, and other elements involved, but gave an erroneous instruction covering the confession and admissions of defendant, the same being substantially as requested by counsel for the defendant, and being in favor of the defendant, and error is not based thereon, but at all events the error being in favor of the defendant, such error is harmless.

We conclude that there was sufficient evidence of surprise to justify the trial court in his discretion to

permit the county attorney to impeach his own witness, and that there was sufficient competent evidence to support the verdict of the jury.

The case is affirmed.

JONES, P. J., and BRETT, J., concur.