## LEEKS v. STATE.

No. A-11505. Aug. 29, 1952.

(245 P. 2d 764.)

Banker & Bonds, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, P. J.  Plaintiff in error Hobart David Leeks, defendant below, was charged by information in the district court of Muskogee county, Oklahoma, with the crime of murder.  The offense was alleged to have been committed on Perry Marzett in Muskogee county, Oklahoma, on or about November 25, 1949, by means of an assault with his fists and feet.  Perry Marzett the victim of the assault lingered and died as a result thereon on January 2, 1950.  The defendant was tried by a jury, convicted and his punishment fixed at life imprisonment in the State Penitentiary.  Judgment and sentence was entered accordingly, from which this appeal has been perfected.

The facts herein involved are briefly as follows:  On the night of December 25, 1949, Perry Marzett went to the home of Reverend W. A. Davis, a Methodist minister whose residence is located at 528 Shawnee street in Muskogee, Oklahoma, in the north part of town.  At about 12:30 a.m. in the night Reverend Davis called a cab for Perry Marzett and also made inquiry about a place for him to stay that night.  Reverend Davis saw Marzett off on a service cab which Reverend Davis paid for.  Reverend Davis testified Perry Marzett was an old man about 68 years of age.  He testified that he had made arrangements for his room for the night at the Rogers Hotel which was operated by Mrs. Ingram.  Reverend Davis further testified that Marzett, in his presence, opened his pocketbook and displayed some bills.  The next time he heard of Marzett was when he was in the hospital as the victim of an assault.

The driver of the cab let Marzett out at the Elliott Hotel which is about a block north of the Rogers Hotel where he intended to go.  Perry Marzett went to the Elliott Hotel apparently to procure a room.  There he talked to the defendant, Leeks, and Celia Mae Williams, the latter occupying the same room and bed with the defendant, they not being married.

Irvin Barnes and Allen Jolly, tenants at the hotel in rooms near Leeks and Celia Mae's room, testified the old man wanted a room and talked to both

Leeks and Celia Mae about one. The defendant testified to such state of facts and said Celia Mae called to his attention the old man who wanted a room. They testified the old man made a display of his billfold there that had bills in it (Leeks admitted he saw it), and Leeks took the old man into his room (the defendant also admitted this to be true), where the tenants heard Celia Mae and the defendant making fun of him. Celia Mae Williams testified she told the defendant to take the old man over to the Rogers Hotel. Shortly thereafter the defendant and the old man were heard by Barnes and Jolly leaving the hotel going down the stairs. The defendant admitted when he took the stand that he did take the old man downstairs and directed him to the Rogers Hotel. Leeks testified in about 5 or 10 minutes he returned and he and Celia Mae went to the Peoples Cafe for food. He admitted he was arrested on the day in question for drunkenness, that he was drinking quite a bit on the night in question both beer and whiskey. He admitted he had whiskey in his room on Christmas Eve. Celia Mae Williams testified defendant bought a half pint of whiskey while at the cafe. The next morning about 7:00 o'clock Perry Marzett was found in an alley about two and a half blocks from the Elliott Hotel. He was taken to the hospital where he lingered several days and died on January 2, 1950. Several suspects were picked up, among them the defendant.

On January 3, 1950, about the hour of 7:30 or 8:00 o'clock p. m., the defendant was taken into custody. He was questioned for about 15 minutes the record discloses, and later that day he was again questioned about 7:30 or 8:00 o'clock p. m. The defendant himself testified that on that day he was put in jail, he was questioned for about 15 minutes and later he was again questioned for about 45 minutes or an hour. He said the manner in which the decedent Perry Marzett met his death was related by the officers to him and they tried to get him to confess the crime. During this questioning, he makes no claim that he was subjected to coercion, threats, abuse or mistreatment or that any promises were made to him. His testimony further reveals about 10:00 a. m., on January 5, 1950, he was removed from his cell and introduced to the county attorney, Mr. Ed Edmondson. He says he was told they were going to take him to Tulsa, Oklahoma, to which he responded, "I said all right". He related that the offciers put the handcuffs on him, and he got in an automobile and rode to Tulsa with Mr. Edmondson, the county attorney, Mr. Paul McQuillen, a Muskogee police officer and Mr. Walter Bolton, evidence man for Muskogee county. On the way over he contends they talked to him practically all the time about the crime, as to how he did this and that. In Tulsa he was subjected to a lie detector test. The record discloses this test was administered by Officer Stege of the Tulsa police department, who testified in the state's case in chief in relation to the manner in which the same was given, but gave no evidence as to the results thereof. Officer McQuillen testified that in Tulsa Officer Stege pointed out to the defendant the portions of his test where he, Leeks, was not telling the truth. The defendant says that Mr. Stege made three tests, and told him he ought to talk to some one about the case, because the machine said he was lying. Leeks said, "I told him I would". Leeks makes no claim that he was ever threatened, struck or abused by any one preceding the trip to Tulsa, during or following the same or during the time he was subjected to the lie detector tests in Tulsa. The nearest approach thereto was a remark he says he heard some man make in Tulsa to the effect, "I'd hate to be in his shoes for the next 24 hours. They are really going to give him the works," to which statement Officer Stege replied, "Well don't say that. Don't say that". He claims this frightened him because he got the idea what he meant, that they would give him the third degree and beat him up, but he admitted no one ever did strike him. In relation to this statement, the Muskogee officers denied in rebuttal hearing any such statement made while they were with the defendant

in Tulsa. Later on cross-examination he said Mr. McQuillen told him, "you think you are tough but you aren't tough. I'm going to soften you up". But he didn't strike him, or make any move to do so. He could remember no other such instances. He made no claim of any promises to get his confession. This expression of defendant's fear falls flat when measured in light of his testimony in his own behalf. On cross-examination he admitted that on the return trip from Tulsa, following Officer Stege's suggestion, he talked to Mr. Edmondson, in the presence of Mr. Bolton and Mr. McQuillen, who testified the defendant was warned by Mr. Edmondson anything he might say could be used against him, and he didn't have to make any statement, and he had the right to an attorney before making one. The defendant himself admitted that Mr. Edmondson told him he need not talk until he consulted an attorney and that he said, "I might as well tell you all about it". Then it was he admitted he slugged the old man, hit him with his fists and his head hit the wall and that he fell to the ground and he kicked him. This confession was not reduced to writing. On cross-examination, he said he told the county attorney these things on the trip back from Tulsa as a "made up statement just to satisfy your curiosity, just to satisfy your curiosity", he repeated. Hence his claim of fear loses its foundation. If fear had been the motive behind the confession he would not have abandoned it for such a flimsy excuse as to satisfy the county attorney's curiosity. He also related that he told Mr. Edmondson that the shoes he wore that night were at his mother's home. These shoes the record discloses were steel tipped shoes. The officers took him to his mother's home and he produced the shoes and they were delivered to the officers and they were offered in evidence.

The officers admitted on cross-examination that they were informed by telephone before they took the defendant to Tulsa that Mr. A. Camp Bonds, of counsel, would be down to see him that afternoon. This information they admitted they did not disclose to the defendant, and took the defendant to Tulsa without a charge being lodged against him and without the authority of a warrant of arrest.

Celia Mae Williams, a hostile witness, testified for the state. After a showing of surprise, the county attorney was granted leave to cross-examine Celia Mae Williams. In chief, she was asked if a couple of days after the night in question she had a conversation with the defendant, to which her answer was yes. She said he asked her if she had said anything about the old man, and she said no. Then she was asked if the defendant said anything else and her reply was no. Here the register of surprise occurred and the impeachment followed. She was asked that if at the preliminary hearing she didn't testify in addition, "I said, 'if they find out who did it, what will they do' and the defendant said 'If they find out who did it and it's me, you know what they will do' ". Her answer was that she so testified at the preliminary hearing, and that he did make that statement to her. On cross-examination she admitted making a signed statement on January 4, 1950. The examiner confronted her with her signed statement therein to the effect, "Christmas Day I had a fuss with Hobart Leeks, and he slapped me and I told him, you quit hitting me because I know enough on you to send you to the pen". She denied making any such statement. (The defendant denied this conversation on cross-examination.)

Several other instances of impeachment of Celia Mae occurred in relation to her pay day and giving Leeks money with which to get something to eat, and concerning the defendant being gone 15 or 20 minutes instead of 5 or 10 minutes when he left with Marzett and until he returned. Other instances of refreshing some of the state's witnesses' memory are complained of on cross-examination

as impeachment, but we are of the opinion such instances such as to Dr. Chandler were for the purpose of refreshing his memory and not impeachment.

The medical proof of two doctors was to the effect that Perry Marzett died from a concussion of the brain as a result of a blow or blows on the head. It was the opinion of Dr. Muckleroy that the fall into the wall would not have produced the curved wound over the right eye, but that it would have been caused by the steel tips of the shoes exhibited to him, and which the defendant admitted he wore the night of the assault. The jury no doubt concluded that the wound was the result of the kick administered by the defendant. The record supports this conclusion.

One of the propositions raised by the defendant is that the trial court erred in not sustaining his demurrer to the evidence for the reason the state wholly failed to prove the corpus delicti by independent evidence. A casual examination of the foregoing evidence discloses the lack of merit in this contention. The testimony of both Dr. Muckleroy and Dr. Chandler was in substance that Perry Marzett died of a concussion as the result of injuries to his head inflicted by blows thereon. Dr. Muckleroy specifically stated the wound over the right eye could have been caused by the steel tips on the shoes the defendant wore that night. Dr. Chandler testified that Marzett was bleeding profusely from his head and around the eye when he was brought to the hospital. The defendant cites and relies on the rule as stated in Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176, 177, as follows:

"In every criminal prosecution it devolves upon the state to prove, first, the corpus delicti, and it they be proved by circumstantial evidence. When it cused.

"The 'corpus delicti' means, when applied to any particular offense, the actual commission by some one of the particular offense charged.

"A conviction cannot be had upon a defendant's extrajudicial admissions alone, unless the state proves in some way the corpus delicti, independent of the defendant's admission. Direct and positive proof is not essential to establish the corpus delicti, and if they be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt.

"Where a dead body is found with marks of violence upon it, or other circumstances that indicate that deceased came to his or her death by unnatural or violent means, proof of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case.

"Where the corpus delicti is established by independent evidence, a conviction based upon defendant's voluntary confession is warranted."

To the same effect is Bond v. State, 90 Okla. Cr. 110, 210 P. 2d 784; Ward v. State, 92 Okla. Cr. 143, 222 P. 2d 173; Fischer v. State, 95 Okla. Cr. 189, 242 P. 2d 463. In light of the testimony of the doctors the corpus delicti was clearly established and this case falls clearly within the rule announced in Osborn v. State and the other cases hereinbefore cited. Under these conditions, the confession the defendant made on the return trip from Tulsa was clearly admissible in evidence, if voluntarily made. The latter question to be hereinafter determined.

The defendant next complains that the trial court erred in overruling the defendant's objection to the introduction in evidence of extrajudicial statements alleged to have been made by the defendant while in the custody of the officer without warrant of arrest, without the aid of counsel, and in violation

of his constitutional rights. It is fundamental that each case must depend upon its own circumstances.

The fact the confession herein involved was made on the trip from Tulsa while in the custody of the police officers and without the aid of counsel does not make it involuntary and inadmissible. It has been repeatedly held by this court that:

"A confession in order to be admissible must be free and voluntary. It must not be exacted by any sort of threats or violence, nor obtained by any direct or implied promises, nor by the exertion of any improper influences.

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him which would otherwise be competent."

Coleman v. State, 70 Okla. Cr. 246, 104 P. 2d 1004, 1005, 105 P. 2d 431; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015; Camp v. State, 95 Okla. Cr. 70, 239 P. 2d 1036; Rowan v. State, 57 Okla. Cr. 345, 49 P. 2d 791; Fischer v. State, 95 Okla. Cr. 189, 242 P. 2d 463.

The admissibility of the confession herein was primarily a question for the trial court. Rowan v. State, supra, and numerous other cases to that effect. Therein the court said:

"Where the competency of a confession is challenged on the ground, that, if made, it was not voluntary, its admissibility is primarily a question for the court. In the absence of the jury, the court should hear the evidence offered respecting the facts and circumstances attending such alleged confession, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. If it is held competent, and the proof of the same admissible, the defendant is entitled to have the evidence in regard to the facts and circumstances under which it was made given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and the jury may disregard it if they are not satisfied that it was voluntarily made."

In light of the foregoing facts we cannot say the trial court erred in finding the confession was voluntarily given. Certainly, if the jury had believed it was not free and voluntary, it was at liberty to disregard it. The mere fact it was made to officers who had custody of the defendant will not render it involuntary nor will the fact he was without aid of counsel. This defendant is a veteran of World War II, and had prior experience in brushes with the law. The question is, Was it free and voluntary? The evidence herein was sufficient to support the finding of the trial court and the jury that the confession was voluntary. The case of Benton v. State, 86 Okla. Cr. 137, 190 P. 2d 168, relied on by the defendant herein is not in point. Herein we have no situation of fear engendered by apparent threats of mob violence.

The defendant next contends the trial court committed reversible error in permitting the county attorney to impeach the testimony of the state's witnesses (in the manner as hereinbefore set forth) without instructing the jury of the force and effect of such impeaching testimony, or the character of this impeachment. This court has held that:

"When contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent

substantive evidence against or in favor of the defendant, and that the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if the jury decides that such statements do have this effect, and the court should further inform the jury that it is improper and unlawful for the jury to consider such statements for any other purpose." Bond v. State, 90 Okla. Cr. 110, 210 P. 2d 784, 785.

See, also, Flauhaut v. State, 66 Okla. Cr. 417, 92 P. 587; Eylar v. State, 27 Okla. Cr. 299, 227 P. 897; Ward v. State, 92 Okla. Cr. 143, 222 P. 2d 173. The state relies upon the case of Foreman v. State, 38 Okla. Cr. 50, 259 P. 176, holding in the body of the opinion that the failure of the court to so limit the impeaching evidence is not always necessarily reversible error. In that case this court does not indicate the extent of the applicability of such rule. We can appreciate the fact that, where there was only a small portion of the record of an impeaching nature and forming an inconsequential part of the record, and in the absence of a request for such an instruction, the failure to give an instruction limiting the evidence to the witness' credibility and not for substantive consideration might not constitute reversible error, but we are not confronted with such a situation herein. Here, a large part of the state's evidence consisted of evidence offered for impeachment purposes of the state's own witnesses. Under such conditions we are of the opinion that it would become the positive duty of the court to limit the consideration of such evidence as going only to the credibility of the witnesses and not to be considered as substantive evidence by the jury. In the instant case we hold the court's failure so to do constitutes reversible error notwithstanding the relaxed application of the rule in Foreman v. State, supra, a manslaughter case where the penalty imposed was only four years. We are of the opinion that the rule must be applied most strictly in a capital case where the defendant is on trial for his life. The trial court's failure to so instruct the jury in this case constitutes reversible error.

Finally, the defendant has not raised the issue of the testimony being offered by the state as to the results of the lie detector test, which we believe materially affected his right to a fair trial. Officer Paul McQuillen of the Muskogee police department, Walter Bolton, county evidence man for the county attorney of Muskogee county, and Captain Harry Stege of the Bureau of Criminal Investigation of the Tulsa police department, all testified at great length in regard to the lie detector test given Hobart David Leeks. This evidence and particularly that of Officer Stege was designed to leave the inference with the jury that Hobart David Leeks was lying and that he should talk to one of the Muskogee officers or some person in whom he had confidence and tell them what he knew about the crime that had been committed down there. Stege said that he told the defendant that the results of the polygraph would be shown the officers. The impression was left that Leeks said he would like to talk to the county attorney alone. This evidence amounted to informing the jury of the results of the lie detector test and was highly prejudicial to the defendant. It was designed to bolster the defendant's oral confession, never reduced to writing, on behalf of the state's case, and it was error to admit it in evidence. In Henderson v. State, 94 Okla. Cr. 45, 230 P. 2d 495, we rejected such evidence tendered by the defendant where he voluntarily submitted to a lie detector test, which test was given in the Henderson case by Officer Stege. The discussion relative to the reason therefor as set out in the Henderson case is lengthy, and we will not repeat it herein, but in substance in syllabus 3 it is summarized as follows:

"The results of lie detector tests were not admissible in evidence for the reason that no foundation was laid by showing that such tests had attained scientific and psychological accuracy, and general recognition, and its operators were capable of definite and certain interpretation."

In the body of the opinion it is pointed out at page 501 of 230 P. 2d, supra, that the figures show the tests prove correct in their diagnosis in about 75% of the instances used. In other words, it is pointed out therein such factors as mental tension, nervousness, psychological abnormalities, mental abnormalities, unresponsiveness in a lying or guilty subject account for 25% of the failures in the use of the lie detector. Hence, the lie detector is not judicially recognized and it is error to project its results into a criminal case. It is therefore obvious that the prosecutor must meticulously guard against its injection into the state's case. This, however, does not exclude the use of the lie detector as pointed out in the Henderson case as an instrument of investigation, appearing, 230 P. 2d at page 504 of the opinion. Nor does it mean that its use may not be shown as a step leading up to a confession, but the results thereof should not be brought out by either the state or the defendant. However, the taking of the test may be considered by the jury along with all the other evidence concerning confessions in determining whether the confession was freely and voluntarily given. But, extreme caution should be invoked to exclude error of this kind in a capital case, where the life or death of the defendant is involved. For all the above and foregoing reasons the judgment and sentence herein imposed is accordingly reversed and remanded, with directions to re-try the defendant.

JONES and POWELL, JJ., concur.