## RIDINGER v. STATE.

No. A-11869. Dec. 9, 1953.

Rehearing Denied Jan. 20, 1954.

(267 P. 2d 175.)

A. Francis Porta and Pat Weaver, El Reno, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant Bert Ridinger was charged by an information filed in the district court of Canadian county with the crime of murder; was tried to a jury, who found the defendant guilty of manslaughter in the first degree, but stated in their verdict that they were unable to agree upon the punishment to be assessed and left the punishment to be assessed by the court. Thereafter, the defendant was sentenced to serve a term of 15 years imprisonment in the penitentiary, and has appealed.

An excellent brief presenting six assignments of error has been filed on behalf of the accused. We shall consider the propositions raised in the brief in the order in which they are presented.

In proposition No. 1, it is contended that an employee of the United States Federal Reformatory at El Reno, whose principal duty is to prevent the escape of prisoners, is a jailer, as that term is used under the Oklahoma statutes. 38 O.S. 1951 § 28. That the court committed error in refusing to sustain a challenge for cause made with respect to such a venireman and forcing the defendant to exercise one of his peremptory challenges to excuse the juror.

The case-made discloses that one Harry Von Tungeln was called to sit as a juror on the case, and in his voir dire examination he stated that he was the reformatory farm manager, that he did not wear a gun and that his duty consisted of the planning of the reformatory farm, the buying for and managing of the farm. That he worked with and had control over prisoners at the farm and that it was his first duty to see that none of them escaped while working on the farm.

The record further discloses that three other employees of the Federal Reformatory were called as prospective jurors and that when it was disclosed on the voir dire examination that they were guards at the Federal penitentiary, the court sustained the challenges for cause interposed as to each of those men, and they were discharged from jury service. The trial court, in his comment upon this action, sought to distinguish between those employees whose employment was solely that of a guard or custodial officer and the juror in question, who was employed as the farm manager. We agree with the contention of counsel for defendant that there was no substantial difference in the nature of the employment of the three jurors who were excused and of the juror Von Tungeln whom the court refused to excuse for cause. However, in the interpretation of the statute pertaining to the qualifications of jurors we are bound by the plain meaning of the statute and are convinced that by its terms federal employees are not disqualified to serve as jurors in the state courts.

We proceed to determine the question presented notwithstanding the fact that as we view the record the defendant is precluded from raising the question by reason of the fact that both the state and the defendant were given an additional peremptory challenge. The state waived its 10th peremptory challenge, but the defendant chose to exercise his additional peremptory challenge which was given to him. The defendant had demanded an additional peremptory challenge at the time he exercised his 7th peremptory challenge by excusing the juror Von Tungeln. This request for an additional challenge was denied. However, the record discloses that after all nine of the peremptory challenges had been used by both the state and the defendant, each were by the court given an additional peremptory challenge. The record contains the following notation:

"The State waived its stipulated additional peremptory challenge and the defendant exercised his stipulated additional peremptory challenge."

We think that by reason of the fact that the defendant was given and used a 10th peremptory challenge that he may not now question the fact that he was forced to use a peremptory challenge to excuse the juror Von Tungeln.

Notwithstanding this, we consider it of public importance that the question presented be determined, for the reason that there is located in Canadian county a large federal prison and that constantly employees of the prison are being called as prospective jurors to serve in both civil and criminal cases.

The statue involved provides:

"All citizens residing in this State, having the qualifications of electors, of sound mind and discretion, of good moral character, not Justices of the Supreme Court, or Judges of the Criminal Court of Appeals, District Court, Superior Court, Court of Common Pleas, or County Court, sheriffs, or deputy sheriffs, constables, jailers, licensed attorneys engaged in the practice of law, habitual drunkards, not inflicted with a bodily infirmity amounting to a disability, and who have never been convicted of any infamous crime or served a term of imprisonment in any penitentiary for the commission of a felony, are competent jurors to serve on all grand and petit juries within their counties". Title 38 O.S. 1951 § 28.

It is our opinion that all of the officials named in the statute as being disqualified to serve as jurors are officials under the state law. No federal official of any sort is mentioned. If federal jailers or United States Marshals or other federal officials were to be exempted from state jury service, they would have been named. The trial court in Canadian county, in the exercise of a broad discretion granted to him, may choose to excuse from jury service employees of the prison who he may think are disqualified by reason of the association which they have had with criminal inmates of the prison, but this is a discretion vested in him and he is not legally obligated to do so by reason of the fact that they are per se disqualified to serve as jurors under the statute.

The Legislature has the power and authority to prescribe the general qualifications for jury service. In re Fry, 205 Okla. 364, 237 P. 2d 624. In this connection, if any future Legislature sees fit to do so, it may extend the disqualifications of citizens to include federal employees as well as certain state officials, such as justices of the peace, judges of the traffic courts, town marshals, etc., who are not now disqualified to serve as jurors under the statute. Our conclusion that the term jailers, as used in the above-quoted statute, means those who are jailers under the state law, is sustained by an examination of the statutes. 19 O.S. 1951 § 541 provides that with the approval of the board of county commissioners the sheriff in the various counties of the state may appoint "deputy sheriffs" and "jailers".

Title 57 O.S. 1951 § 54 provides the duty of the jailer as follows:

"The jailer or keeper of the jail shall, unless the sheriff elect to act as jailer in person, be a deputy appointed by the sheriff, and such jailer shall take the necessary oaths before entering upon the duties of his office: Provided, that the sheriff shall in all cases be liable for the negligence and misconduct of the jailer as of other deputies."

It is our opinion that only those who are named as jailers under these statutes are included in the disqualifications set forth in Title 38 § 28 O.S. 1951, and, accordingly, the trial court properly denied the challenge for cause addressed to the juror Von Tungeln.

In proposition No. 2 it is contended that:

"It is improper for the bailiff to communicate with the jurors in his charge on any subject connected with the trial and if, upon timely suggestion and objection, it appears to the court that a bailiff has been guilty of any misconduct through such communication, the court should declare a mistrial."

In connection with this assignment of error, the record discloses that a woman was selected as one of the twelve jurors to serve in the trial of the case. Because of the presence on the jury of this woman, the trial court, at the first morning recess, appointed a special woman bailiff in the person of one Dorothy Lorenzen. Counsel for defendant first learned of the appointment of a special bailiff during the noon recess, when he saw her in company with the jurors on the courthouse lawn. Immediately after court convened at 1:30 counsel moved for a mistrial because of the appointment of a special bailiff for the specific reason that she was "an open avowed and vocal enemy of A. Francis Porta, the attorney

for the defendant, and has publicly announced to various and sundry people her hatred of me because I charged a fee for defending her son for the crime of manslaughter."

At the time this motion was presented counsel for the accused called the attention of the trial court to the fact that several months previously, in a conversation with the trial judge, he had advised the judge of the enmity of Mrs. Lorenzen toward him on account of a situation which had arisen by reason of the defendant representing her son in a criminal prosecution against him. After this objection was presented, the trial court stated that at the time he made the appointment of the special bailiff, it had not occurred to him that there was any ill will or enmity on the part of the special bailiff toward any of the attorneys in the case, but further stated that since counsel had called it to his attention, he did remember that counsel had two or three months previously stated that Mrs. Lorenzen, as deputy court clerk, treated him discourteously in his business and that she held some grudge against him arising out of his representation of her son. There was no showing that the special bailiff had made any effort to talk to any of the jurors about the case or to create any prejudice against the accused or his counsel. The trial court thereupon overruled the motion for mistrial but did immediately remove and discharge Mrs. Lorenzen as special bailiff.

The question presented then is whether the trial court, under such circumstances, committed error in the appointment of Mrs. Lorenzen, as there is a total absence of any proof of misconduct on the part of Mrs. Lorenzen during her short term as a special bailiff. It is true that counsel stated in his motion for mistrial that he saw the special bailiff with the jurors on the courthouse lawn and that she seemed to be conversing with the female juror. However, conversation between the jurors and the bailiff is not prohibited by statute. The only prohibition directed at the bailiff insofar as conversation is concerned is that he may not communicate with the jurors on any subject connected with the trial. 22 O.S. 1951 § 853. The appointment of Mrs. Lorenzen did not itself constitute reversible error. When the alleged hostility of the special bailiff was called to the trial court's attention, he promptly discharged her. The only way in which this court would be justified in reversing the conviction upon this assignment of error would be for a showing to be made in the record that the special bailiff, during the short time she served, had improperly conversed with the jurors on some subject connected with the trial. Prejudice is not presumed under such a state of the record. It must be affirmatively shown.

It is next contended that the corpus delicti was not established by independent evidence and therefore it was improper to admit evidence of a confession by the defendant to prove the crime was committed. In support of this assignment of error, counsel cite the case of Edwards v. State, 58 Okla. Cr. 15, 48 P. 2d 1087, 1096, wherein it was said in the body of the opinion:

"In every criminal prosecution the burden rests upon the state of proving the corpus delicti beyond a reasonable doubt. In prosecution for homicide the corpus delicti consists of two fundamental and necessary facts: First, the death; second, the criminal agency of another as the cause; as applicable to this case, it was necessary to show, first, that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted by the defendant."

In the case relied upon, however, the court plainly stated that a conviction may be had on the extrajudicial confession of the defendant where there is independent evidence of the corpus delicti. In the third syllabus in which the law of the case was given by the court, it was said:

"In a prosecution for homicide the corpus delicti consists, first, in the proof that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted."

There was abundant evidence in the case that the deceased died as a result of gunshot wounds. Counsel for the accused so state in their brief. It was unnecessary as a part of the corpus delicti to prove that the wound was inflicted by the defendant Ridinger. In the case of Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176, 177, the deceased was found lying dead in the yard of his residence. An examination of his body showed that a bullet from a .22 caliber gun had killed him. The only evidence to connect the defendant with the commission of the crime was the extrajudicial confession made by the accused at the time of his arrest several years later. This court sustained the conviction and in the syllabus the points of law involved were summarized as follows:

"In every criminal prosecution it devolves upon the state to prove, first, the corpus delicti; second, that the crime charged was committed by the accused.

"The 'corpus delicti' means, when applied to any particular offense, the actual commission by some one of the particular offense charged.

"A conviction cannot be had upon a defendant's extrajudicial admissions alone, unless the state proves in some way the corpus delicti, independent of the defendant's admission. Direct and positive proof is not essential to establish the corpus delicti, and it may be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt.

"Where a dead body is found with marks of violence upon it, or other circumstances that indicate that deceased came to his or her death by unnatural or violent means, proof of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case.

"Where the corpus delicti is established by independent evidence, a conviction based upon defendant's voluntary confession is warranted."

See, also, many other cases which support these rules of law, including Gorum v. State, 60 Okla. Cr. 248, 63 P. 2d 765; Edwards v. State, 46 Okla. Cr. 77, 288 P. 359; Brown v. State, 9 Okla. Cr. 382, 132 P. 359; Choate v. State, 12 Okla. Cr. 560, 160 P. 34, L.R.A. 1917A, 1287; Leeks v. State, 95 Okla. Cr. 326, 245 P. 2d 764, 765.

In Leeks v. State, supra, this court held:

"Where the unconscious body of a person, who never regains consciousness and dies, is found with marks of violence upon it, or other circumstances that indicate that deceased came to his or her death by violent means, proof of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case."

In this case the proof showed that the officers were called to the residence occupied by the defendant and the deceased and they there found the deceased lying dead on the floor in a pool of blood. Death was caused by gunshot wounds inflicted by a shotgun. A shotgun was nearby. Also, in the house were the defendant and his girl friend and another woman companion. All had been drinking intoxicants. The defendant after his arrest told the officers that he had shot the deceased. The testimony of the other witnesses showed that the deceased Hank Keith and the defendant Bert Ridinger were both employees of the Chicago, Rock Island & Pacific Railroad Company and lived together in a rented house in El Reno, sharing equally the expenses of maintaining the house. On the night of March the 14, 1952, the two men, together with three women, commenced drinking intoxicating liquor, which continued throughout the evening, during which time they went to a dance at the Veterans of Foreign Wars clubhouse. After the dance had ended, the five returned to the house occupied by defendant and deceased and the drinking continued.

At one point during the night Mae Ryel, the sweetheart of the defendant, testified she saw the deceased leap upon the defendant and Keith started beating the defendant on the face and head, stating that he was going to kill him; that she pulled the deceased off the defendant and persuaded him to go to his bedroom and the door was shut after him. She later heard a noise in the livingroom and when she returned to the room she saw the deceased on the floor. She asked the defendant what had happened and he did not say anything.

Edna Estes was also present, but this lady testified that she had become so intoxicated she did not remember anything that had occurred. The defendant, testifying in his own behalf, testified that he remembered nothing that occurred from the time he left the dance hall to the time he was in the automobile with the police on the way to the police station, when he was advised by one of the officers that he had killed a man.

The evidence showed that the deceased Keith was shot twice, once in the chest just over the heart and once in the groin, and that both shots were fired at close range. The assertion in the brief of defendant that the corpus delicti was not proved was unfounded as the evidence of the police officers that a body was found with gunshot wounds inflicted thereon was sufficient to establish the corpus delicti, which merely means the establishment that a crime had been committed by someone. It is not necessary as a part of the corpus delicti to establish that a particular individual committed the crime. However, in this case, aside from the confession of the accused, we find circumstantial evidence sufficient to show that the deceased came to his death at the hands of the defendant. Only three parties were in the house at the time of the homicide Mae Ryel was in the kitchen preparing coffee according to her testimony. She testified that when she ran into the livingroom Edna Estes was lying on the divan in a drunken stupor, entirely oblivous to what was going on, the deceased was on the floor, and the defendant Ridinger was standing nearby. She said she asked the defendant if he shot the deceased and he said, "If I did, I didn't mean to."

The shotgun was lying on the floor. She had seen it in the defendant's bedroom and knew that the defendant had borrowed the shotgun previously from one Arthur Hudson. This assignment of error is without substantial merit.

It is next contended that the court committed fundamental error when he failed to give the jury an instruction on circumstantial evidence. No such instruction was requested.

It is established law that it is unnecessary to give an instruction on circumstantial evidence unless all of the evidence of the state is circumstantial. In this connection, it has been held that the confession of an accused constituted direct evidence and that where there was evidence of a confession having been made by the accused, no instruction on circumstantial evidence should be given. Dennard v. State, 83 Okla. Cr. 286, 176 P. 2d 831; Cordonnier v. State, 86 Okla. Cr. 291, 192 P. 2d 298.

In proposition No. 5 it is contended that the court committed reversible error in refusing to give an instruction on self-defense. Counsel for the accused prepared three forms of instruction on self-defense and requested that they be given, which request was refused.

At the time of oral argument counsel for the accused impressed the court with the merit of his argument on this proposition. But a more careful study of the record and of the law applicable to such a situation discloses that the trial court acted properly.

The defendant did not plead self-defense. He expressly denied knowing anything at all about what occurred in connection with the killing. He testified that he did not remember anything from the time he left the dance hall to return home until he was in the automobile with an officer being transported to the police station, and the first thing he remembered was a statement by the officers that "You killed a man."

There was testimony by Mae Ryel that a few minutes before the homicide occurred she pulled the deceased off the defendant in the livingroom of the house and that just before she did the deceased was beating on the defndant and saying, "I am going to kill you." There was an attempt to show some threats made by the deceased but the defendant himself said in his testimony that "He had never made no threats against me." And defendant further stated that he and the deceased Keith were good friends up to the time of his death.

Such evidence as to alleged threats was not admissible until a predicate had first been laid by the introduction of some evidence tending to show that the killing was in self-defense. Fields v. State, 85 Okla. Cr. 439, 188 P. 2d 231. At the close of the evidence of the defendant the county attorney moved the court to strike all that part of the evidence of the defendant pertaining to threats and also all of the evidence tending to show that the deceased was a dangerous and quarrelsome person, and the court sustained such motion and struck such evidence from the consideration of the jury. This action of the court was proper because there was no evidence of self-defense. However, even though the court properly struck such evidence from consideration of the jury the defendant probably received some benefit from it because such evidence had been heard by the jury and it would be difficult for them to erase it from their minds.

This very proposition was considered in the recent case of Wilson v. State, 96 Okla. Cr. 137, 250 P. 2d 72, 74, decided November 5, 1952, wherein this court held:

"Defendant who testified he was unconscious at time fatal blow was struck in altercation with deceased, that he had no recollection of having a fight with the deceased, and presents no theory that he struck blow in defending himself from an attack, would not be entitled to an instruction on self-defense."

We do not mean to say that under no circumstances could a person who lost his memory and could not recollect what occurred at the time of a homicide plead self-defense. If there was a showing by other witnesses that the accused acted in self-defense, then he would be entitled to have the jury instructed on that issue. However, in the instant case, no one testified to any fact whatsoever that would indicate the killing was in self-defense. It is true that Mae Ryel testified that she saw the parties in an altercation a few minutes before the fatal shots were fired, but she further testified that the last time she saw the deceased, he had gone into his bedroom and closed the door. She did not claim to have seen the fatal shots fired and there were no facts related upon which a plea of self-defense could be based at the time of the homicide. The court in his instructions to the jury was limited to the issues presented by the evidence.

It is contended in proposition No. 6 that the trial court committed reversible error in instruction No. 9 wherein the court, in referring to testimony offered by the state to the effect that defendant had made certain oral statements in the nature of admissions against interest made the further statement, "the defendant denies making such statements." for the reason that the defendant did not deny making such statements, but expressly stated he had no recollection of making such statements and that the statement in such instruction invaded the province of the jury and was a comment on the evidence.

The police officers testified that the defendant did make certain statements to them concerning the homicide to the effect that he killed the deceased. The defendant did not specifically deny making such statements, but testified that he did not recall having any conversation with the officers and did not recollect taking any officers and showing them any guns in the closet of his room. It was the theory of the defendant in connection with this proposition that the demeanor and attitude of the defendant was very important to the jury and that when the court took the attitude that defendant had denied making such statements to the police officers when he had not made such denial had a profound effect on the jury and caused them to disbelieve the other evidence on behalf of the accused.

We have carefully read instruction No. 9, to which this assignment is directed. It is a lengthy instruction and in the interest of brevity will not be copied.

We cannot perceive how the defendant was prejudiced by the giving of this instruction. The major portion of it was exceedingly favorable to him and went further than we have ever suggested a trial court should go in instructing the jury in connection with the consideration of alleged statements made by an accused at the time of his arrest. We do not believe that that part of the instruction to which the complaint is directed created prejudice against him. The jury undoubtedly understood from the evidence that defendant did not admit making such statements but only stated that he did not remember having made them. Under his denial of remembering having made the statements, the Supreme Court of Oklahoma has said that this was equivalent to a denial that he had made them and did not preclude the introduction of such statement. Johnson v. Moore, 52 Okla. 274, 152 P. 1073.

In Webster's dictionary (Fifth Edition) among other definitions of the word "deny", there is the following:

"To disclaim connection with or responsibility for, to refuse to acknowledge, to contradict, to disavow."

If we take the common definition of the word "deny" as given by Webster, and, reading these words into the instruction, it would appear that the court said, "The defendant disclaims connection with or responsibilty for such statements,'* or "The defendant refuses to acknowledge such statements, or disowns or disavows them."

The defendant certainly did not admit making such statements and the language used by the court was such language as the court would ordinarily use in informing the jury that it was their responsibility to determine whether such statements were actually made and whether they were made under such conditions that the defendant had mental capacity to fully understand the consequences of his act. Instruction No. 9, as written, was exceedingly favorable to the accused, and objection to it was not legally justified.

We have given the record the serious, painstaking study and deliberation to which it was entitled. Especially, in view of the excellent and lengthy brief presented on defendant's behalf, we have given close study to each assignment of error. The homicide was an unfortunate outcome of an all-night drinking party. The jury did not fix the punishment. The defendant might have been given a much more severe punishment than was given. If such had been done, however, in the interest of justice we would have felt that it should have been modified. The trial court must have given careful consideration to every angle of the case because we feel that the punishment pronounced was fair. It was not excessive. It was not too low. It was in conformity to the facts. Under the regulations

of the Parole Board, the defendant will be eligible for parole after serving five years in the penitentiary. Based upon his past record of peaceable behavior, no doubt the defendant will so conduct himself that he will be paroled at the earliest opportunity afforded him under the rules of the Pardon and Parole Board.

The judgment and sentence of the district court of Canadian county is affirmed.

POWELL, P. J., and BRETT, J., concur.