## Commonwealth v. Saunders, Appellant.

150

Argued May 25, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY and MUSMANNO, JJ.

Norman Landy, with him Norman Paul Wolken and Wolken & Landy, for appellant.

William Claney Smith, Assistant District Attorney, with him Edward C. Boyle, District Attorney and George H. Ross, Assistant District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, September 24, 1956:

Shortly after seven o'clock on the morning of June 2, 1954, John T. Neelans, a 62 year old attendant at a gasoline station located at Reedsdale Street and Ridge Avenue in the City of Pittsburgh, was struck on the head, shot in the chest, and robbed, by someone who stepped out from the side of the station; he died a few minutes later. The crime thus committed was murder in the first degree, the only question being the identity of the assailant. The defendant, Earl Richard Saunders, a lad not quite 16 years of age at the time of the crime, was charged with the murder, tried, convicted, and sentenced in pursuance of the recommendation of

the jury to life imprisonment, the court having denied him a new trial.

The record is extraordinarily voluminous. No trial could have been conducted with more meticulous care and judicial fairness, nor did counsel for the defendant overlook any point helpful to his client. A careful reading of the testimony does not support appellant's contention that the evidence in regard to the identification of the perpetrator of the crime was not sufficiently clear and convincing to justify the conviction.

A witness named Smaltz, a workman who happened to emerge at the time of the occurrence from a steel supply company where he was employed and which was in close proximity to the gasoline station, saw the scuffle between the robber and his victim. He testified as to the cap, shirt or jacket, and jeans worn by the assailant, the gray or white mask which covered part of his face, that he was a colored man, that there was something unusual about his gait—"he had sort of a gangling walk"—and that he ran up Fulton Street. Smaltz further testified that he attended a line-up in the police station two days after the murder where he picked out Saunders by his posture, the way he was built and the manner in which he walked. However, at the coroner's inquest and at the trial he stated that he could not "positively" identify him, as he had not had a good look at his face.

Another witness named Grainer, employed as a truck driver for an express company, saw the man running up the street with a white mask covering the lower part of his face; his height was about five feet, ten inches; he wore a pair of blue jeans.

A witness named Wenzelburger, employed as a milk driver for a dairy company, testified that he was not able "positively" to identify the man; he saw him run-

ning up Fulton Street and turning left into Medley Street; he noticed that as he ran "he sort of held his arms away from his body"; he saw him "sort of adjust" his mask as he turned into the latter street. At the police line-up Wenzelburger identified defendant on his "general appearance as it looked to me the morning I saw the crime,"—on his color, his height, his build and the way he carried his arm.

Arizona Nicholson, a clergyman, testified that the assailant was a colored man, that he was partially masked, and that he was approximately five feet, eight inches tall. He identified the defendant at the police line-up but could not now "swear to it" not having been able to see his face clearly, but he "believed" that defendant was the man he had seen with the mask; he resembled the fellow he saw bending over the man.

The principal witness for the prosecution was a ten-year old lad named Edward Hargrove, whom the trial judge, in the court's opinion denying a new trial, characterized as a "bright lad," saying that "It was obvious to the court, to the jury and to the spectators that young Edward was telling the truth. He handled himself so intelligently, so quietly and so effectively on cross-examination that no one could doubt the sincerity of his story." This young negro boy was on friendly terms with defendant; they had known one another very well for from three to five years; their houses were only five doors apart, they attended adjoining schools, and they saw one another practically every day. Hargrove testified—not aggressively nor venomously but with laudable caution and restraint—that he happened to be standing with his little sister that early morning in front of the defendant's house at Fulton and Medley Streets when he saw the gas-station attendant come down Ridge Avenue to open the station door. He saw someone wearing a mask come out from the side of the station

and attack the attendant, and he heard the victim's screams. He saw the robber go through the man's pockets and then run up Fulton Street still wearing his mask, but when he came to the corner of Fulton and Medley Streets, right across the 24 foot wide street from where Hargrove was standing, the mask slipped for a moment, Hargrove got a good look at his face and immediately recognized the defendant. He told his mother and stepfather what he had seen and that it was the defendant who had committed the crime, and he identified defendant at the police line-up. He testified at the trial that he was sure it was the defendant, that he had "never doubted it," that he had had a good look at his face and had recognized him also by his arm which "was kind of bent out";[1] of all the boys he knew none looked like the defendant. Hargrove was well acquainted with defendant, he saw his face clearly even though briefly, his identification of him was without reservation, and his testimony was not weakened in the slightest by cross-examination.

Defendant denied his guilt, and several members of his family testified, by way of an alibi, that they saw him in bed at various times between six-thirty and eight o'clock A.M., two of them—a ten-year old brother and an eight-year old nephew—at about the time of the occurrence of the crime. Some of them said that he was in bed that June morning under the covers with his clothes on, including a pair of blue jeans, from which the jury might well have believed that he had but recently and hurriedly slipped into bed, although his family testified that it was his habit to sleep with his clothes on.

---

[1] Defendant had a bent, crippled arm which he could not completely straighten, and also a peculiar walk to which the witness Smaltz referred.

This brings us to one of the principal issues in the case which arises from the so-called "recantation" of the Hargrove boy's testimony. It appears that some five months after the trial, in an examination in the office of defendant's counsel,[2] he stated: "I was going to change my mind because it could be somebody else who looks like Richard [the defendant] and I don't think it was him now." Because of this development the court itself examined Hargrove in connection with the argument on the motion for a new trial. At that hearing Hargrove insisted that he had told the truth when he testified at the trial, but that he had had "bad dreams" and "something kept telling me it wasn't him." The court came very definitely to the conclusion that it was not "something" but more likely "somebody" who "kept telling" him. He gave his testimony this time under obvious stress, tension and emotion and occasionally with tears. While he insisted that it was because of the "bad dreams" that he came to believe that it was not the defendant whom he had seen, it appeared that the boys in the neighborhood, friends of the defendant, would no longer play with Hargrove as they had been wont to do, nor talk to him except to call him names and charge him with having told a lie at the trial; some of them told him they weren't allowed to play with him because of his having "told on Richard." There were other manifestations of pressure brought to bear upon him to get him to retract his identification which he had made so positively at the trial. Never-

---

[2] There is not the slightest basis for any criticism of defendant's counsel in connection with this "recantation." Having heard that Hargrove had made statements expressing doubt as to his previous identification of defendant they naturally and justifiably sent for him in order that they might question him in regard to it, but they gave notice to the District Attorney's Office to have a number of his staff present if he so desired, but the invitation was declined.

theless, while he insisted upon the "bad dreams," he would not admit that what he had testified to at the trial was a lie. The court was unanimous in its finding that Hargrove had told the truth at that time and that it was the "recantation" that "rang false." This, therefore, is not a case of an essential witness admitting that he had committed perjury, in which event a new trial should be granted (*Kvaternik v. Yochim*, 360 Pa. 387, 389, 61 A. 2d 815, 816); on the contrary, as was said in *Commonwealth v. Palarino*, 168 Pa. Superior Ct. 152, 155, 77 A. 2d 665, 666, quoting from 16 C.J. 1188, §2715, ". . . recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true." Certainly the court below cannot be held to have been guilty of an abuse of discretion in refusing a new trial in view of the little faith it placed in Hargrove's so-called recantation.

We find no merit in appellant's contention that the court committed error in permitting the witnesses Smaltz, Wenzelburger and Nicholson, to testify that they had identified the defendant at the police line-up. In many respects identifications made immediately after the occurrence of a crime are more reliable than when testified to at a later trial. As pointed out in 70 A.L.R. 911, the majority of jurisdictions have decided in favor of the admission of such so-called "extrajudicial identification" both as substantive and corroborative evidence. It must be borne in mind that we are dealing here, not with the hearsay testimony of witnesses who merely heard such identifications being made, but with testimony given by those who themselves made the identifications at the line-up.

Appellant's criticism of the court's charge to the jury on the ground that it did not sufficiently call at-

tention to the failure of the witnesses, other than the Hargrove boy, to make a positive identification of the defendant at the trial, is wholly unwarranted. The charge carefully summarized the testimony of each of these witnesses and instructed the jury that it was their duty to evaluate the testimony, the opportunity there had been for identifying, and whether a proper identification was made. While it was said in *Commonwealth v. Kloiber*, 378 Pa. 412, 424, 106 A. 2d 820, 826, 827, that, where the accuracy of the identification is doubtful the court should warn the jury that the testimony as to identity must be received with caution, it was there also pointed out that where the opportunity for positive identification is good, and the witness—as here Hargrove—is positive in his identification, such testimony need *not* be received with caution and may be treated even as the statement of a fact. Incidentally, it is there further stated that "a positive, unqualified identification of defendant by one witness is sufficient for conviction even though half a dozen witnesses testify to an alibi." (citing many cases).

There was admitted into evidence a shoe which had been taken from defendant the day after the commission of the crime and which had on it a smudge of blood. Defendant was not harmed by this exhibit because the witness who testified in regard to it, the Director of the County Crime Laboratory, admitted that there was nothing to show that the blood on the shoe was that of the decedent, nor the length of time that the blood had been there, nor how it got there.

The complaint that the court refused to admit testimony offered by defendant that some two to three months after his arrest he had expressed his willingness to take a polygraph or "lie detector" test—it being argued that this showed consciousness of innocence—is

likewise without merit. Since it is uniformly held that such a test is not judicially acceptable (see *Commonwealth ex rel. Riccio v. Dilworth,* 179 Pa. Superior Ct. 64, 67, 115 A. 2d 865, 866), it is obvious that neither a professed willingness nor a refusal to submit to such a test should be admitted. Defendant's offer was merely a self-serving act or declaration which obviously could be made without any possible risk, since, if the offer was accepted and the test given, the result, whether favorable or unfavorable to the accused, could not be given in evidence.

Distressing as is the conviction of a sixteen-year old boy of the crime of murder there is nothing in the record of the trial in this case nor in any of the proceedings in connection with it that would have warranted the court below in granting a new trial. Not only is defendant's complaint unfounded that the charge of the court was prejudicial, but, on the contrary, if the trial judge displayed any leaning at all it was in defendant's favor, evidencing an earnest desire to safeguard and protect his every right.

The judgment of sentence is affirmed.

----

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I would grant a new trial in this case. It is possible that the defendant is guilty of the crime of which he stands convicted. Fate has indeed woven about him a web of circumstance which he must pierce and break into irrelevant and unconnected strands if he is to stand free of suspicion in the public square of easy impressions and facile conclusions. But it is not in the public square that he is to be legally adjudged. No matter with what distrust he may be regarded on the streets of moral appraisement, no matter what accusative clouds hover over him in the community of undis-

ciplined opinion, it is the duty of the courts to pronounce judgment only according to the standards which the courts have proclaimed and reaffirmed in the books of governing law.

With those standards, like lamps of pure incandescence, lighting the pages of the record before me, I cannot reach the decision that Earl Richard Saunders has been conclusively proved guilty by evidence which can stand juridical analysis.

Of course, it can be said in support of the conviction, that the proof advanced by Saunders, in behalf of his defense, which was an alibi, left something to be desired. But it is not only proof of innocence which opens the door of liberation to a man accused of crime. An accused is entitled to an acquittal if the Commonwealth fails to establish his guilt beyond a reasonable doubt. Was the Commonwealth's evidence in this regard so reliable, credible, and trustworthy that on it the figure of Justice may stand securely without removing her blindfold?

I agree with the Majority Opinion when it says: "The record is extraordinarily voluminous. No trial could have been conducted with more meticulous care and judicial fairness, nor did counsel for the defendant overlook any point helpful to his client." I have the highest admiration for the Trial Judge, who is not only a learned and able jurist, with an illustrious career at the bar before being elevated to the bench, but who is eminently scrupulous in preserving the constitutional guarantees of all those who come before her. The Chief Justice well says that in this case she evidenced "an earnest desire to safeguard and protect his [the defendant's] every right."

Nevertheless, in the discharge of my duties as an appellate judge, I am compelled to say that the conviction

in this case rests upon props which are so infirm and loose that only to slightly shake them, in applying the test of reliability, is to bring the entire superstructure of adjudicated guilt tumbling to the ground. The main props of the Commonwealth's case are the witnesses Carl A. Smaltz, David C. Wenzelburger, Arizona Nicholson, and Edward Hargrove.

The only issue at the trial was whether the defendant Saunders, a 16-year old boy, was identified as the slayer of the victim, John T. Neelans, who, in the early morning of June 2, 1954, while working as a gasoline station attendant, was shot and slain by a bandit who escaped after the deed. Does the record support that kind of identification which justifies a sentence committing the defendant to prison for the remainder of his natural life?

The witnesses Wenzelburger, Nicholson, and Smaltz, testified that they saw the happening of the crime and the escape of the bandit, but they could not and would not identify Saunders as being the bandit. One would assume that with this failure of the witnesses to declare Saunders the man they saw on the morning of June 2, 1954, their testimony, so far as identification was concerned, would be discarded as utterly worthless. One would naturally further assume that in its review, this Court would strike from the record the testimony of these three witnesses on the identification phase of the case. We find, however, much to my amazement and what must eventually be to the consternation of the entire criminal bar of Pennsylvania, that this Court declares this type of nugatory evidence, for reasons which they give and which I will quickly come to, highly acceptable, reliable, and desirable. The Majority Opinion says that the fact that Wenzelburger, Nicholson, and Smaltz could not identify the defendant at the trial

not only does not weaken the reliability of their testimony but, in many respects, actually strengthens it!

Let us examine this startling innovation in the law of evidence. Two days after the robbery, Wenzelburger, Nicholson, and Smaltz were summoned to the police station to attend what is known as a "stand-up." Eight men were lined up before them and they were asked, one at a time, to say whether any one of the eight standees was the man they had seen at the happening of the robbery. According to the Commonwealth, these three witnesses identified Saunders at the stand-up. However, at the trial, as already indicated, they could not identify Saunders as the robber. In this state of affairs, how can it be said that the person they identified at the stand-up is the *same* man they refused to identify at the trial? What mystic chain connects the man identified at the stand-up with the utter stranger (to them) at the trial? How can the man identified at the stand-up be similarized to the man at the trial when the latter man, according to the witnesses' own statements, has no lodgment in their memories?

The Majority Opinion says that: "In many respects identifications made immediately after the occurrence of a crime are more reliable than when testified to at a later trial." In other words, the Majority says here that one who makes an identification and then suffers amnesia as to whom he identified, is more reliable than the person who at a trial fixes his gaze on the defendant and positively asserts: "Yes, that is the man I saw strangle John Jones."

The Commonwealth seeks to connect up the man identified at the stand-up with the defendant at the trial by asserting that the man identified at the stand-up was known as No. 6, and that Earl Richard Saunders is No. 6. But at the trial Wenzelburger, Nicholson and

Smaltz could not identify Saunders as No. 6. They could not identify him at all. So far as they were concerned, Saunders could have landed in the courtroom that very morning from the planet Mars.

The witness Arizona Nicholson testified: "Q. Did you believe and do you believe, Reverend, that number six, as shown on Commonwealth's Exhibit No. 6, is the man that you believe that you saw running from the gas station, or saw at the gas station at the corner of Reedsdale and Ridge on June 2nd, 1954? A. Well, it's —it's a doubtful thing as to know—just surmise, because you were unable to see the person's face altogether, clearly."

We must interpolate here that the identification which was presumably established at the stand-up, and which the Majority accepts without a disturbing doubt, was made of a man's face which was covered by a mask! Here is Arizona Nicholson's testimony on that phase of the matter: "Q. As a matter of fact, you didn't get a very good look at him at all, did you? A. No, I didn't. Q. And you didn't even get a good look at his face, did you? A. What I saw, I saw it true enough. Q. But you didn't see his whole face, did you? A. No, I didn't. Q. You saw only part of his face? A. I didn't say I saw his whole face. Q. You only saw part of his face? A. That's right. Q. And you are not identifying Earl Saunders now, are you, as being the man you saw with the mask? A. How did you say that? Q. Well, let's put it in as simple a way as we can—Is this the boy, this boy, is he the man you saw with the mask? A. I couldn't say yes that he is, I couldn't say that."

At the Coroner's Inquest, Arizona Nicholson was asked: "You are not identifying Earl Saunders as being the man with the mask, are you?" And his answer was: "I can't swear to it." At the trial he confirmed

the testimony he had given at the Coroner's Inquest, namely, that he couldn't say that Earl Saunders was the man under the mask. It is this kind of testimony which the Majority lauds as, in many respects, being more reliable than testimony which identifies a defendant at a trial.

The witness Carl A. Smaltz also presumably identified No. 6 at the stand-up, but he didn't know who No. 6 was, nor could he say at the trial that Saunders was the No. 6 he had seen at the stand-up. Let us look at his testimony: "Q. . . . At the time you checked number six did you know who number six was? A. No, sir. . . . Q. And were you able to identify Saunders at the Coroner's Inquest as being the man you saw at the scene of the crime the morning it was committed? A. I couldn't identify him. Q. You could not identify him? A. That's right. Q. Is that right? A. That's right. Q. And I take it you still cannot identify him? A. Positively, no. Q. That's right, you can't do it. Now you were also unable to identify this boy as being the person you saw even though at the Coroner's Inquest he walked back and forth across the room for you, isn't that correct? A. That's correct. Q. You saw him walk, at the line-up you only saw him standing, and you still were unable to identify him as being the person you saw that morning at the scene of the crime? A. I saw him walk at the line-up. Q. You also saw him walk at the line-up? A. Yes. Q. But you still are not able to identify him as being the person whom you actually saw that morning at the scene of the crime, is that correct? A. Correct."

Thus, although Smaltz did not know who No. 6 was when he was supposed to have identified him at the stand-up, although he did not know whether No. 6 was in the clothes of the defendant at court, and although

he did not know who the defendant was, or whether he had ever seen him before, this Court nevertheless found in his testimony that kind of testimony which, in many respects, is more reliable than testimony of a positive identification at a trial. In what respects?

The testimony of David C. Wenzelburger is even more interesting than that of Smaltz's: "Q. Now, Mr. Wenzelburger, did you or are you able to identify positively who that man was that came up Fulton Street and turned in Medley? A. Not positively, no, sir. . . . Q. How was he dressed? A. All I could say, he had dark clothes on. Q. Dark clothes. And did he have a mask on? A. Yes, sir. . . . Q. But is it a fact, Mr. Wenzelburger, that at no time did the mask come off his face so that you could see his face? A. Not that I seen. Q. In other words, you never saw his face? A. That's right. Q. Is that correct, sir? A. Yes, sir."

Here is a witness who is supposed to identify a No. 6 at a stand-up as the man he saw at the scene of the crime, but whose face he never saw at any time! And this also is the type of testimony that the Majority says is more reliable than positive identification at a trial.

In support of its conclusion that: "In many respects identifications made immediately after the occurrence of a crime are more reliable than when testified to at a later trial," the Majority Opinion cites 70 A.L.R. 911. It would appear that the Majority's study of the cases in 70 A.L.R. profited the Majority no more than its perusal of the record. Of the hundreds of cases cited in the article referred to—"Extrajudicial Identification of Defendant in Criminal Case," Pages 911 to 923— not one—not one!— supports the proposition asserted by the Majority.

What some of the cases say is this: If the testimony of an identifying witness at a trial is attacked on the

basis that his identification is of recent formulation, it can be shown in refutation of this charge that on a previous occasion, at a stand-up or elsewhere, the witness had previously identified the defendant. This kind of extrajudicial identification is, of course, not only proper, logical, and just, but necessary under the circumstances. Otherwise, the imputation of fabricated testimony would go uncorrected. In fact, many States hold that extrajudicial identification may be called to the attention of the court and jury even if there has been no impeachment of the identifying witness or his testimony. For instance, in *State v. Frost,* 105 Conn. 326, the Court said: "The trustworthiness of the identification is of the first importance. An identification of an accused, made publicly for the first time by a witness in court, when there presumably have been many opportunities for the witness to have seen the accused and to have heard him spoken of by a given name, may be open to question; but, if it be shown that the witness identified the accused previously and the first time after his arrest or incarceration and under circumstances which remove the suspicion of unfairness or unreliability, the prior identification, together with the circumstances surrounding its making, will be of utmost aid in determining the trustworthiness of the identification made in the court room."

In the situations outlined in the above case and in all the cases referred to in the article in 70 A.L.R., it is taken for granted that the witness *does* identify the accused at the trial. No legal writer ever conjured up so grotesque a situation as accepting the identification by a witness who at the trial does *not* identify. If Mr. Smith's horse is stolen on Monday and he identifies (without taking) a certain horse on Tuesday as that stolen horse, but on the following Saturday, when a

horse is brought before him, he is unable to say whether it is his horse, how can it be said that the horse he selected on Tuesday must be the horse he lost on Monday?

The Majority Opinion says that more than one-half of the jurisdictions "have decided in favor of the admission of such so-called 'extrajudicial identification' both as substantive and corroborative evidence." But we must repeat that in all those States the "extrajudicial identification" is an identification which is later corroborated in court. The Majority Opinion does not point to one authority, nor does the Commonwealth, where an extrajudicial identification is accepted when the so-called identifying witness refuses to identify the accused in court.

The Majority Opinion says further: "It must be borne in mind that we are dealing here, not with the hearsay testimony of witnesses who merely heard such identifications being made, but with testimony given by those who themselves made the identifications at the line-up." The Majority Opinion persists in the fallacy of not distinguishing between witnesses who identify the accused in court and witnesses who do not.

If the Majority's proposition is to prevail (and unfortunately it will unless corrected) it will mean that a witness cannot correct a mistake or a misimpression once he has spoken. Once a Wenzelburger, Nicholson or Smaltz says, no matter where, that a certain person is the individual he saw committing a crime, that spoken identification becomes recorded in imperishable bronze which can never be erased, altered, or amended even though Wenzelburger, Nicholson, or Smaltz later learns that the person he identified as the telltale criminal was across the seas when the crime was committed. The proposition advanced by the Ma-

jority places a premium on hasty conclusions and snap judgments. It glorifies the person who forms an opinion on incomplete evidence and derogates the one who reflects and deliberates. It repudiates the proverb that "knowledge comes but wisdom lingers." It makes of first impressions lasting impressions and of last impressions rejected impressions. It ignores the realism that the first view of a landscape, geographical or physiognomical, does not always tell the whole story. It overlooks the observation that many a case of love at first sight becomes something less than romance on the second and third view.

The evidence of Wenzelburger, Nicholson and Smaltz, so far as identification is concerned, could never support a conviction were it not for the scaffolding erected by the Majority to hold it in place, but while this scaffolding can keep Saunders in prison for his life, whether he be innocent or guilty, it will remain as a scaffold (unless taken down) to, some day, hang some innocent man.

If, in all my experience at the bar and on the bench, if in all my readings on the law as a student, judge and lawyer, if in all my viewings of courtroom drama on stage, screen and television, I had to choose what is perhaps the most incongruous testimony ever presented in a courtroom where the issue of life and liberty was involved, I would say that it is the testimony of Wenzelburger, Nicholson, and Smaltz.

The need for a new trial because of the sheer absurdity of the so-called identification testimony of Wenzelburger, Nicholson, and Smaltz is so imperative that I feel it is unnecessary to discuss the testimony of the ten-year-old Edward Hargrove.