**Annie Lee HALL and Michael Douglas McNeil, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–852.**

Court of Criminal Appeals of Oklahoma.

Aug. 31, 1977.

Rehearing Denied Nov. 15, 1977.

Richard A. Hoffman, Asst. Public Defender, Tulsa, for appellants.

Larry Derryberry, Atty. Gen., Michael P. Kane, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM:

The appellants, Michael Douglas McNeil and Annie Lee Hall, hereinafter referred to as defendants, were jointly charged, tried before a jury and convicted in the District Court, Tulsa County, Case No. CRF–76–266, for the offense of Arson in the First Degree. Punishment was assessed at a term of two years under the direction and control of the Department of Corrections of the State of Oklahoma for the defendant Annie Lee Hall and a term of five (5) years to ten (10) years for the defendant Michael Douglas McNeil. From the judgments and sentences in accordance with the jury verdicts the defendants have perfected their consolidated appeal.

Briefly stated, the evidence adduced at trial is as follows: Mrs. Joyce Hannah testified that she was the owner of a home located on South 118th E. Avenue in Tulsa and that she and her husband rented the residence to the defendant Michael McNeil and his wife. Mr. Jack Clear an insurance agent with M.F.A. Insurance Company then testified that in July of 1975 he had a meeting with the defendants and Mrs. McNeil and sold them a "basic renter's policy" on the contents of their rented home and that the policy amount of $20,000.00 was suggested to him by defendant McNeil.

Mrs. Carol Young then testified that she lived across the street from the defendants' home and that on January 13, 1976, she returned to her residence at approximately 1:10 p.m. At that time she saw the defendants leaving their home in an automobile.

All parties waved to each other. Mrs. Young stated she was able to fix the time due to the fact that she observed the clock when she entered her house. She further testified that after approximately three minutes she heard her dog bark, looked outside and saw that the house across the street was on fire. She then called the fire department.

J. L. Foot, Fire Chief in charge of Communication and Planning for the Tulsa Fire Department then testified that his log indicated that at 1:18 p.m. on the date in question, the communication officer on duty received a call concerning the subject fire. The records indicated that the first truck arrived at the scene at 1:21 p.m.

Captain David Towry testified that he was in command of the first fire engine at the scene. He stated it took them approximately thirty minutes to get the fire under control since the fire tended to reignite and flash back. Towry stated this was a characteristic of a flammable liquid or something other than a regular combustible. He further related that the living area was totally burned out, the kitchen area was very heavily burned and that there was considerable fire damage to the roof structure in the west portion of the attic. The refrigerator and the shelves in the kitchen area were virtually empty of foodstuffs. On cross-examination Towry stated that the evidence indicated that the avenue of the firespread went from the living room to the kitchen and from the living room through a window up into the roof and under the overhang to the attic. He found no evidence of accelerant containers during cleanup. He further stated that modern artificial fibers and other materials give off toxic fumes but couldn't say whether they would cause flashbacks. He further stated that he became suspicious of arson only because the occupants of the house had been gone for such a short period of time.

Fire Investigator Loren B. Sunday was then qualified as an expert and testified that he arrived at the scene at approximately 1:45 p.m. on the day in question. He testified that the fire had two separate

points of origin, one in the upstairs area and one in the living room-kitchen area. It was his opinion that the fire in the lower level burned from the living room into the kitchen and that a separate and distinguishable fire started in the upstairs area, burning from the top downward. He further related that there was no visible electrical malfunction and that there was a flammable liquid pattern on the first floor. It was his opinion that the fire was intentionally set basing his conclusion on the presence of two separate fires, the presence of a flammable liquid pattern, the burn time involved and the extent of damage to the structure. He eliminated any accidental causes because the occupants had been seen leaving the structure shortly before the discovery of the fire. He further testified that if the particular fire in question had burned under ordinary circumstances from an ordinary source of ignition, the burn time would have been approximately forty-five minutes to an hour. On cross-examination Sunday stated that there was no way of telling what materials were in the burned out areas. There was no evidence as to what the accelerant might have been. The State then rested.

The first defense witness was Captain Edwin Alphin of the Tulsa Fire Department who testified that the predominant burning in the attic was directly above the living room; that fire could have been transferred from room to room through something as simple as the studding; that the window on the west side of the house had been blown out and that the heat and fire travelled out and up, possibly into the attic. He further stated that the only unusual thing about the fire was the fact that it spread so fast and was so large. On cross-examination Alphin stated that he was not trained in fire investigation.

Calvin Teague then testified that he had been doing business with defendant Hall for ten years, and that he had known her from the horse training and trading community and had met defendant McNeil through her. He further stated that he had traded with horse people all his life and that he had never heard anything bad about

either defendant, although he did know of defendant McNeil's past troubles with the law.

Defendant Hall then testified on her own behalf stating that on the day in question she was feeling ill and had stayed home and taken Darvon as a pain killer. Near lunch time her son-in-law, defendant McNeil, awakened her and told her that they should go out to tend their horses. When she left the house she remembered seeing Mrs. Young and waving to her. The defendants then went to a feed store. She further stated that all family earnings were placed in a common pool, as was the settlement of approximately $14,000.00 which she received on the insurance claim.

A. J. Coles then testified that he was in the horse trading business and had known defendant Hall for approximately twelve years and that there had never been any reason to question her character or integrity. He also had a high opinion of defendant McNeil although he was unfamiliar with his background.

Defendant McNeil then testified in his own behalf stating that he was a truck driver, construction worker and horse trader and that he had been twice convicted of felony offenses. On the date in question he returned home at approximately 11:30 a.m. and awakened his mother-in-law in order to ask her to go with him to check on a horse. When leaving he saw Mrs. Young across the street and waved. They then proceeded to a feed store and subsequently returned to the residence about 3:00 p.m. after feeding the horses. He further stated that it was the insurance agent's suggestion that a $20,000.00 policy be taken out and that he had only made one insurance claim in his life. He further stated that he never tried to hide his criminal background when applying for the insurance.

The defense then recalled Captain Sunday who testified he was present at an interview with the defendants at the central fire headquarters and that the conversation had been taped. The defendants then asked that the complete transcription

of the conversation be admitted into evidence and the State objected because of the mention of a polygraph examination. The trial court overruled the objection, admitted the full statement and cautioned the jury not to consider any reference to a polygraph test. The defense then rested.

The defendants' first assignment of error urges that the defendants were denied a fair and impartial trial by the refusal of the trial court to allow the court reporter's notes to be used in lieu of a preliminary hearing transcript for the purpose of impeaching a State's witness.

The defense brief indicates that defense counsel recalled from the preliminary hearing that Officer Sunday testified that there were three separate fires in the home. However, during the trial Sunday testified there were only two separate fires, his testimony being as follows:

"Q. (By Mr. Hoffman) Have you ever at any time thought there were three separate fires, sir?

"A. (By Mr. Sunday) No, sir.

"Q. Have you ever testified that in fact there were three hot spots in this house?

"A. Yes, sir.

"Q. Could you explain, please?

"A. There were two fires, the fire on the lower level involving two rooms; there were two areas of fire on the bottom floor, both of them joining to make one fire.

"Q. I see."

The defendants argue that they were substantially prejudiced when, after the State rested, the trial court refused to allow defense counsel to call the court reporter who reported the preliminary hearing to read her notes to impeach Officer Sunday.

■ It is disputed whether the Court rules of the District Court, Tulsa County allowed the preparation of a transcript of the preliminary hearing at public expense for the purpose of impeachment. This is irrelevant, as ordinarily the procedure to be followed in obtaining a transcript of preliminary hearing for an indigent defendant is set out in *Jones v. State,* Okl.Cr., 488 P.2d 593 (1971). Once the defendant timely files his motion for transcript and the affidavit of poverty the burden of showing why he should not have a transcript to prepare for trial falls on the State. See, *Morgan v. Graham,* Okl.Cr., 497 P.2d 464 (1972) and *Brinlee v. State,* Okl.Cr., 543 P.2d 744 (1976).

■ It is apparent, however, that we have recognized alternative methods of examining prior testimony. See, *Morgan v. State, supra; Brinlee v. State, supra;* and *Kirk v. State,* Okl.Cr., 555 P.2d 85 (1976). This recognition would seem to include the use of such alternative methods and impeachment of the State's witnesses. Had the defendants properly preserved the record by filing a motion for transcripts they then would have been allowed to use the testimony of the court reporter to impeach the testimony of the State's witness. In the instant case, the defendants did not use due diligence in acquiring the transcript and therefore cannot assert as error the refusal of the trial court to allow the use of the alternative method, *Kirk v. State, supra.* We find the defendants' first assignment of error to be without merit.

The defendants next contend that the trial court committed reversible error in overruling the defendants' demurrer and motion for directed verdict because there was insufficient evidence to prove that a crime had been committed. Again we disagree.

The defendants were charged and convicted under the provisions of 21 O.S. § 1401, which reads as follows:

"Any person who willfully and maliciously sets fire to or burns or by the use of any explosive device or substance destroys in whole or in part, or causes to be burned or destroyed, or aids, counsels or procures the burning or destruction of any dwelling house or adjoining outhouse or garage or contents thereof, whether occupied, unoccupied, or vacant, the property of himself or another, shall be guilty of arson in the first degree, and upon conviction thereof shall be punished by a fine not to exceed Twenty-five Thousand

Dollars ($25,000.00) or be confined to the penitentiary for not more than twenty (20) years or both."

■ Defendants argue that the State only presented circumstantial evidence against them and failed to properly prove the corpus delicti of arson in the first degree. In *Smith v. State,* Okl.Cr., 555 P.2d 626, this Court, citing *Williams v. State,* 21 Okl.Cr. 161, 205 P. 772, recognized that the crime of arson is more likely to be proved by circumstantial evidence than direct evidence. To prove the corpus delicti of arson in the first degree the State must demonstrate that there was a burning of a dwelling house, whether occupied or vacant, and that the burning was caused by a criminal act.

■ Without again reciting the facts, it is our opinion that the State presented sufficient evidence to meet its burden of proof. Where there is competent evidence in the record from which the jury could reasonably conclude that the accused was guilty as charged, this Court will not interfere with the verdict since it is the exclusive province of the jury to weigh the evidence and determine the facts. *Turner v. State,* Okl.Cr., 479 P.2d 631. There was sufficient competent evidence presented in the trial of the instant case to prove the corpus delicti of arson in the first degree and to support the verdict of the jury. The defendants' second assignment is also meritless.

The defendants' third assignment of error contends that the trial court erred by excluding certain portions of statements made by defendant McNeil to Officer Sunday; the portions excluded being statements by defendant McNeil concerning his willingness to take a polygraph examination. The record reflects that complete transcripts of the taped statements were admitted into evidence over the objection of the State and that the trial court admonished the jury to disregard those statements made by the defendant McNeil concerning his willingness to take a polygraph test.

In *Fulton v. State,* Okl.Cr., 541 P.2d 871, this Court recently held that introduction into evidence of a polygraph examination for any purpose, even if admitted upon stipulation of all parties, is error. See also *Leeks v. State,* 95 Okl.Cr. 326, 245 P.2d 764.

■ However, the issue before us is whether the trial court erred in admonishing the jury to disregard those statements made by the defendant concerning his willingness to take such a test. We find no error. In *Commonwealth v. Saunders,* 386 Pa. 149, 125 A.2d 442, the Pennsylvania Supreme Court held as follows:

"Since it is uniformly held that such a test is not judicially acceptable  .  .  . it is obvious that neither a professed willingness nor refusal to submit to such a test should be admitted. Defendant's offer was merely a self-serving act or declaration which obviously could be made without any possible risk, since, if the offer were accepted and the test given, the result, whether favorable or unfavorable to the accused, could not be given in evidence."

■ Since this appears to be a case of first impression in Oklahoma, we hereby adopt the reasoning of *Commonwealth, supra.* To allow such a self-serving statement to be admitted into evidence would violate the spirit of *Fulton, supra.* Statements by an accused concerning his willingness or refusal to take a polygraph are inadmissible. No error was committed by the trial court and the defendants' third assignment is also meritless.

■ The defendants' fourth assignment of error contends that the prosecutor throughout the course of the trial made statements which were improper thereby denying them a fair and impartial trial. Defense counsel first complains that the prosecutor kept referring to "gasoline" while questioning Officer Sunday. However the record reveals that this is not the case. Sunday and not the prosecutor made reference to "gasoline" and other "flammable liquids" when talking about the flammable liquid pattern. Objections were made to the use of the term "gasoline" and the objections were sustained. No requests

for admonishments were made. We find no error requiring reversal or modification.

■ The defendants further argue that the prosecutor erred in referring to conversations between the character witness Teague and defense counsel during cross-examination of Teague. The relevant portion of the cross-examination is as follows:

"Q. Thank you very much. Now, when counselor asked you have you heard anything bad about the defendant being in trouble, you replied yes, you had. When was the first time you were made aware of that, sir?

"A. When Mr. Hoffman made me aware of that.

"Q. Alright, sir. Now, that was when, again?

"A. Oh, a week ago."

It is apparent from the above that the prosecutor was trying to determine on cross-examination when the character witness found out about defendant McNeil's prior convictions in order to test his credibility. This is a well established cross-examination technique. *Jiminez v. State,* Okl. Cr., 545 P.2d 1281. The record shows no indication that the prosecutor was in bad faith.

The defendants next argue that the prosecutor was continually argumentative with the defendants. Again we disagree. The transcript of the evidence reflects that attorneys for the State and the defendants were well prepared and proceeded to try the case in the best tradition of our adversary judicial system. If anyone was argumentative it would appear to have been the defendants in answering certain questions posed by the prosecutor.

■ Defendants further complain that the prosecutor indicated on one occasion that the defendant McNeil had been convicted of armed robbery when in fact he had been convicted only of robbery. However, it appears that the prosecuting attorney immediately apologized and the error, if any, was harmless.

■ The defendants next complain that during closing argument the prosecutor

erred when he made the following comment, to-wit:

"You would have never known whether or not this man before you, Michael McNeil, had been convicted of a crime had I not put him on the stand. Why did counsel make that statement to you?"

\*    \*    \*    \*    \*    \*

". . . But ladies and gentlemen, coupled with that statement of putting the defendant on the stand, why? I am exposing the whole truth, his former convictions. Ladies and gentlemen, don't be misled by this, regardless, they don't have to prove anything but once they take the stand in the name of common sense and the instructions you have been given, they have no special halo around their head on not counting their credibility. In other words, ladies and gentlemen, they are subject to the same credibility tests of all the State's witnesses."

Obviously the prosecutor was only trying to rebut the prior argument of defense counsel. Defense counsel was the one who made the original statement concerning the defendant McNeil taking the stand.

The Court has examined the record concerning the other instances complained of by the defendants concerning comments made by the prosecutor and we are of the opinion that there are no errors which would require modification or reversal.

■ The defendants' final assignment of error urges that they were denied a sufficient record on appeal by the trial court's refusal to order the preliminary hearing transcript for the purpose of being included with the record on appeal. Defense counsel argues that the transcript is necessary to further corroborate arguments made concerning his second assignment of error and his inability to properly impeach Officer Sunday.

In *Morgan v. Graham,* Okl.Cr., 497 P.2d 464, this Court held that an indigent defendant is not entitled to a free transcript as a matter of course. The record indicates that on May 17, 1976, defense counsel filed

a request that the trial transcript be prepared at State expense. Pursuant to said request the trial court ordered that the trial transcript, as indicated by the designation of record, be prepared and paid for by the State. Defense counsel in his designation of record did not request a transcript of the preliminary hearing.

Title 20 O.S.1975, § 106.4(b) in relevant portion reads as follows:

"In a criminal action, if the defendant shall present to the judge his affidavit that he intends in good faith to take an appeal in the case and that a transcript of the reporter's notes is necessary to enable him to prosecute the appeal, and that he has not the means to pay for the transcript, the court, upon finding that there is reasonable basis for the averment, shall order the transcript made at the expense of the county court fund."

It is apparent from the above that the defendants failed to advise the trial court that they required for purposes of appeal a verbatim transcript of the preliminary hearing. Failing to make such a request, the defendant may not raise the matter for the first time on appeal. The defendants' final assignment of error is also without merit.

From an examination of the entire record, it is the opinion of this Court that the defendants received a fair and impartial trial, that no substantial right was prejudiced and that the judgments and sentences appealed from should be, and the same are hereby *AFFIRMED.*