## Commonwealth v. Camacho-Vasquez

C.P. of Lebanon County, no. CP-38-CR-1995-2005.

*Megan Ryland-Tanner,* for Commonwealth.
*Charles P. Buchanio,* for defendant.

CHARLES, *J.,* January 29, 2007—To use a military analogy, the parties to this litigation are engaged in a "battle" over a parole violation within the context of a much larger "war" involving the efficacy of therapeutic polygraph examinations. Here, the Commonwealth seeks to revoke defendant's parole largely because he flunked a polygraph examination that was designed to reveal details about his underlying offense. Defendant argues that polygraphs should never be employed as a strategy to justify parole violation punishment. In the alternative, defendant decries the tactic of using the polygraph examination as a means to garner a confession that he had never been previously required to offer.

We are well aware that polygraphs are routinely used as part of sex offender therapy. We were somewhat surprised when we found no Pennsylvania appellate precedent to provide guidance with respect to the propriety of therapeutic polygraphs. Because of this, we have expanded the scope of our research to include decisional precedent from courts in other states. Based largely upon the wisdom we gleaned from extra-Pennsylvania precedent, we will affirm the use of polygraphs

as a therapeutic tool in sex offender counseling. However, for reasons that will be articulated in more detail below, we will refuse the Commonwealth's request for parole revocation under the unique facts of this case.

## I. FACTS

On March 8, 2006, defendant Jafet Camacho-Vasquez entered a nolo contendere plea to the following charges:

(1) Indecent assault (M-1)

(2) Indecent assault (M-1)

(3) Corruption of minors (M-1)

(4) Corruption of minors (M-1)

Based upon this plea, we sentenced defendant on July 26, 2006 to receive identical sentences on Counts I and II. On each count, the defendant was sentenced to pay the cost of prosecution, a fine of $100 and be imprisoned in the Lebanon County Correctional Facility for a period of 90 days to two years less one day. As a condition of parole, we ordered that the defendant undergo sexual offense counseling.

At some unknown date, the defendant was paroled. The Lebanon County Probation and Parole Department assigned him to a sex offender treatment program sponsored by Reading Specialists. On November 27, 2006, the defendant underwent an intake interview with therapist John Flavin of Reading Specialists. During the course of this intake interview, the defendant was told that honesty was a critical component of his treatment. In the words of Mr. Flavin, "progress in therapy is dependent upon honesty."

To determine the honesty of a client's statements, Reading Specialists relies heavily upon polygraph ex-

aminations. According to Mr. Flavin, the polygraph results will drive the nature of his company's therapeutic decisions. If an individual claims innocence and passes a polygraph, therapy is deemed unnecessary. On the other hand, if an individual claims innocence and fails a polygraph, Reading Specialists assumes that he is lying. Unless the individual recants his claim of innocence, he will be unsuccessfully discharged from the program.

At the parole revocation hearing, Mr. Flavin testified that the defendant professed innocence during the initial intake interview. Defendant's claim of innocence did not waiver when he was confronted with the police reports and the prospect of a polygraph. Therefore, a polygraph was scheduled and conducted. Four questions were asked of the defendant. Each of these four questions related to the crime to which he pled no contest. As to each of the four crime-specific questions, the defendant was found by the polygrapher to be deceptive.

On December 18, 2006, defendant was confronted with the results of the polygraph. He was given another opportunity to admit the underlying criminal offense. Once again, he reiterated his innocence. Because of the defendant's obstinate refusal to admit culpability, Reading Specialists determined that it could do nothing further and discharged him from its care.

Following the defendant's discharge from Reading Specialists, the Commonwealth filed a motion to revoke parole. This motion was based upon the defendant's inability to complete the Reading Specialists' sex offender program. At the date of the initial parole violation hearing on December 27, 2006, both parties couched the debate as involving the propriety of a therapeutic polygraph. We asked the parties to brief that issue and con-

tinued the parole violation hearing until January 17. In the meantime, we completed our own preliminary research regarding the issue as we perceived it.

On January 17, the Commonwealth sought to change its definition of this dispute. Instead of focusing upon the polygraph, the Commonwealth suggested that we should not look beyond the fact that defendant was discharged from therapy. According to the Commonwealth, the defendant's discharge, by itself, justifies a parole violation. Not surprisingly, the defendant asks us to look beyond the fact of his discharge in order to examine the underlying reason why the discharge occurred.

Within the milieu of the above dialogue, we received testimony from Mr. Flavin, who explained exactly what was done at Reading Specialists and why. Following the hearing, the parties asked for and were given one additional week in which to file briefs. All pertinent information has now been presented and this matter is now ripe for disposition.

## II. DISCUSSION

### A. *General Standard for Parole Violation Hearings*

In a parole revocation hearing, the Commonwealth bears the burden of establishing that a defendant violated the terms of his probation. See *e.g., Dorsey v. Commonwealth of Pennsylvania, Board of Probation and Parole,* 132 Pa. Commw. 476, 573 A.2d 628 (1990). Unlike a criminal trial, where the Commonwealth's burden is beyond a reasonable doubt, at a revocation hearing, the Commonwealth need only prove a violation by a preponderance of evidence. *Commonwealth v. Simms,* 770 A.2d 346 (Pa. Super. 2001). In any parole

violation hearing, the court is required to address two questions:

(1) Whether the parolee has in fact violated one or more conditions of parole; and

(2) Should the parolee be recommitted to prison as a result. See *Commonwealth v. Simms, supra.*

Essentially, we are asked to evaluate whether the conduct of the parolee establishes that parole has been an ineffective vehicle of rehabilitation. See *e.g., Commonwealth v. Brown,* 503 Pa. 514, 469 A.2d 1371 (1983).

## B. *Admissibility of Polygraph Evidence*

John Flavin's testimony left little doubt about the importance of therapeutic polygraphs within the sex offender treatment program of Reading Specialists. In fact, it is obvious to us that defendant's discharge from sex offender counseling—and his resulting parole violation—were inextricably linked to his deceptive polygraph result. Given the realities of this case we would be remiss if we did not directly address the viability of therapeutic polygraphs for convicted sex offenders.

The general rule in Pennsylvania is that "any reference to a [polygraph] test which raises an inference concerning the guilt or innocence of a defendant is inadmissible." *Commonwealth v. Sneeringer,* 447 Pa. Super. 241, 255, 668 A.2d 1167, 1174 (1995). See also, *Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325 (1971). "Since it is uniformly held that such a test is not judicially acceptable, . . . it is obvious that neither a professed willingness nor a refusal to submit to such a [polygraph] test should be admitted." *Commonwealth v. Saunders,* 386 Pa. 149, 157, 125 A.2d 442, 446 (1956). (citation omitted) In fact, in some cases the mere

mention of a polygraph test during a trial will warrant the granting of a motion for mistrial. *Commonwealth v. Watkins,* 750 A.2d 308 (Pa. Super. 2000).

Relying upon the general principles outlined above, the defendant suggests that we should dismiss the parole revocation motion as being impermissibly grounded upon an inadmissible scientific test. Upon superficial examination, the defendant's argument has some appeal. However, it cannot bear up to close scrutiny.

There is a vast difference between an accusatory polygraph and a therapeutic one. With respect to the former, the polygraph is used as a confrontational tool to extract evidence of uncharged criminality. In the latter, the polygraph is used as a tool to identify risk behaviors and encourage honesty. Within the panoply of constitutional rights afforded to every criminal defendant, use of accusatory polygraphs is not to be condoned. On the other hand, convicted criminals do not enjoy the full panoply of constitutional rights. As we see it, depriving therapists of a tool that can be highly useful in rehabilitating a known offender strikes us as going too far.

Although we have found no appellate precedent in Pennsylvania regarding the use of therapeutic polygraphs, there is abundant guidance from across the country, much of which involves situations very similar to the one at hand. Some of the most oft-cited cases include the following:

(1) *People v. Miller,* 208 Cal. App. 3d 1311, 86 ALR 4th 705 (1989)—In *Miller,* the defendant was convicted of a sex offense against a child. He challenged a condition of probation that required him to submit to polygraph examinations. The defendant argued that the polygraph condition was "overbroad" because there were no restric-

tions on the questions to be asked by the polygrapher. The court stated: "This is patently incorrect. The polygraph condition was expressly requested by the probation officer and imposed by the court to monitor defendant's compliance with the condition prohibiting unsupervised contact with young females. Thus, any polygraph examination administered to defendant necessarily will be limited to questions relevant to compliance with that condition." 80 ALR 4th at p. 707. Based upon this analysis, the court permitted use of the therapeutic polygraph.

(2) *Varnson v. Satran,* 368 N.W.2d 533 (N.D. 1985)—In *Varnson,* a parole board's decision was predicated in part upon an inmate's failed polygraph examination. The North Dakota Supreme Court articulated the general rule that polygraphs are not admissible in a criminal trial. However, the court noted that parole release hearings "differ significantly" from other types of fact-finding trials. The Supreme Court of North Dakota concluded that inmates are not entitled to "a complete panoply of rights and procedural safeguards designed for free citizens in an open society." Accordingly, the Supreme Court affirmed the parole board's reliance upon the polygraph examination.

(3) *Gyles v. State of Alaska,* 901 P.2d 1143 (Al. App. 1995)—In *Gyles,* the defendant was convicted of sexually abusing a minor. He was ordered to participate in sex offense counseling that included use of polygraphs. The parole officer's stated purpose for seeking the polygraph was to "gain some insight and determine if he has re-offended or has had any contact with minors." *Id.* at p. 1146. Although the Alaska appellate court did not quarrel with the use of a polygraph, it was concerned

about the breadth of the parole officer's polygraph request. Noting that even parolees have a Fifth Amendment right against self-incrimination as it relates to uncharged crimes, the court remanded the case to the trial judge for a determination of whether a polygraph could implicate the defendant in later criminal proceedings.

(4) *State v. Ostreicher,* 2002 WL 450393 (Conn. Super. 2002)—In *Ostreicher,* the court approved the concept of therapeutic polygraphs, stating: "The court finds that polygraph testing furthers the legitimate purposes of the defendant's probation because it has valid rehabilitative and deterrent purposes. For this reason, the court finds the polygraph machine to be a suitable tool which may be utilized by the probation authority to supervise sexual offenders." However, the Connecticut appeals court also expressed concern about the implication of the polygraph upon a parolee's Fifth Amendment right against self-incrimination. The court stated that the defendant "has lost the privilege against self-incrimination in relation to crimes for which he has been convicted and may be compelled to answer questions related to that offense as a condition of his probation." However, the court emphasized that no defendant can be compelled to answer questions that could be used against him if he were tried for another crime.

(5) *Mangarella v. State,* 17 P.3d 989 (Nev. 2001)—In this case, the Nevada Supreme Court was asked to rule upon the constitutionality of a statute that specifically authorized the use of therapeutic polygraphs for parolees. While upholding the use of therapeutic polygraphs, the Nevada court emphasized that the questioning must "reasonably relate" to the purpose of parole and cannot be used as an investigative tool to disclose previously unreported criminality.

(6) In *State v. Naone,* 990 P.2d 1171 (Hawaii App. 1999), the defendant was ordered into sex offender treatment as a condition of being accepted into a deferred prosecution program. The sex offender treatment required defendant to submit to a polygraph. He refused. The Hawaii appeals court noted: "When defendant expressed concern about the use of the polygraph results, the family court immunized him from the evidentiary use of the polygraph results. When defendant objected to the person who would administer the polygraph examination, he was given the option of being examined by a polygraph examiner of his choice. Under these circumstances, the record amply demonstrates that the family court did not abuse its discretion when it concluded that the defendant's refusal to take the polygraph examination . . . constituted a violation of the terms [of his deferred prosecution program]." *Id.* at p. 1189.

(7) *State v. Riles,* 957 P.2d 655 (Wash. 1998)—The Washington Supreme Court addressed the concept of therapeutic polygraphs in the context of a defendant who had been convicted of raping a child. The court stated: "The use of the polygraph examination may enhance the assessment, treatment and monitoring processes by encouraging disclosure of information relevant and necessary to understanding the extent of present risks and compliance with treatment and court requirements. When obtained, the polygraph data achieved through periodic examinations is an important asset in monitoring the sex offender client in the community." *Id.* at p. 663. Based upon this analysis, the court permitted the use of therapeutic polygraphs.

Not every jurisdiction has permitted the use of therapeutic polygraphs. See *e.g., Patton v. State,* 580 N.E.2d

693 (Ind. App. 1991). However, it appears from our research that the overwhelming majority of jurisdictions where the issue was addressed have favored the use of therapeutic polygraphs in one form or another. Based upon our survey of the majority view favoring polygraphs, we draw the following conclusions:

(1) Therapeutic polygraphs can be an important tool in a parole officer's arsenal of rehabilitative devices, especially when the parolee is a sex offender who has displayed deviant sexual tendencies.

(2) Practically every case we read cited the United States Supreme Court's decision in *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In *Murphy,* the United States Supreme Court declared that a defendant cannot be compelled as a condition of probation/parole to answer questions that could be used against him if he were tried for another crime. Because of *Murphy,* every court that permitted use of therapeutic polygraphs also created barriers limiting the polygrapher's ability to ask questions pertaining to uncharged criminality.

(3) Questions in a therapeutic polygraph about the underlying offense that created the offender's parole status will be permitted. A defendant who has already admitted or been found guilty of a crime cannot be punished twice and therefore jeopardy does not attach when a parolee is required to answer questions about his/her underlying offense.

(4) All questions employed in a therapeutic polygraph must somehow "reasonably relate" to either the deterrent or rehabilitative purposes of the defendant's parole. "Fishing expeditions" during the therapeutic polygraph process should not be permitted.

Based upon the above conclusions, we hold that the Lebanon County Probation Department did not err by referring the defendant to a sex offender treatment program that employed the use of therapeutic polygraphs. We also conclude that it is appropriate to ask most defendants questions about the underlying offense that created his/her parole status. Had the defendant in this case entered a guilty plea, the above holdings would have ended our inquiry. However, the factual wrinkle that requires us to progress further in our analysis is that this defendant entered a nolo contendere plea.

## C. *Effect of Defendant's Nolo Contendere Plea*

Conceptually, the Commonwealth seeks to camouflage the defendant's argument through oversimplification. At oral argument, the Commonwealth's attorney suggested that our inquiry should be limited to the following: "Defendant was ordered into treatment. He did not complete his treatment. Ergo, he should be re-incarcerated." Not only would such an approach be unfair, but it would also contravene appellate precedent. See *e.g., Miller v. Pennsylvania Board of Probation and Parole,* 784 A.2d 246 (Pa. Commw. 2001).[1]

As we pierce the veil of defendant's violation to examine its true source, we conclude that the genesis of defendant's violation is his refusal to admit the facts of his underlying crime. Therapist Flavin acknowledged that Reading Specialists' decision to discharge the de-

---

1. In *Miller,* the court held that a defendant cannot be violated for failing to comply with an impossible or highly impractical parole condition. By the very nature of this ruling, courts are required to examine the nature of the parole condition violated and why the defendant was or was not able to comply.

fendant was made because he failed the polygraph regarding his underlying offense and continued to stubbornly deny culpability. We agree that in most cases, this would be enough to justify a parole violation. However, this case is different than most in that the defendant's plea was one of nolo contendere rather than guilt.

Loosely translated, the Latin words "nolo contendere" mean "no contest". When a defendant enters a nolo contendere plea, he says in effect, "I will not contest these charges." *Commonwealth v. Hayes,* 245 Pa. Super. 521, 369 A.2d 750 (1976). While there is no difference in terms of punishment between a guilty plea and a nolo contendere plea, there is nonetheless a significant difference in terms of what the defendant is required to acknowledge under oath. When a defendant enters a plea of guilty, he is required to acknowledge under oath that he committed the offense charged. In contrast, a nolo contendere plea merely requires that a defendant acknowledge he has no defense. As it relates to this case, the difference between a guilty plea and a nolo contendere plea has more than semantic import.

In this case, the defendant entered a nolo contendere plea as part of a plea agreement with the Commonwealth. As such, the Commonwealth knew, or should have known, that the defendant would not be required to actively acknowledge guilt. In return for the Commonwealth's forbearance with respect to an admission of guilt, the defendant agreed to be sentenced and punished for the crimes charged. Now the Commonwealth is turning around and saying to the defendant: "Even though we agreed that you would not have to admit guilt in return for your agreement to suffer a specified punishment, we now wish to extend your specified punishment because

you will not admit guilt." This approach strikes us as both unfair and violative of the parties' plea agreement.

Had the defendant entered a guilty plea, we would have embraced the Commonwealth's argument. A person who admits under oath that he is guilty of a crime may be made to confront the details of that crime in a therapeutic setting and, if necessary, submit to a polygraph as part of the therapeutic process. If the defendant fails to do this, he can be subject to parole revocation.[2]

To the extent that the Commonwealth believes that therapeutic sex offender treatment is important, it has an obvious remedy—refuse the proffer of a nolo contendere plea.[3] If the Commonwealth, or the victim, perceives that sex offender therapy is particularly important for a given defendant, all the Commonwealth need do is insist upon a guilty plea or proceed to trial. Here, because the parties agreed to the nolo contendere plea, and because it would be unfair to incarcerate the defendant under the circumstances presented, we will refuse the Commonwealth's motion to revoke the defendant's parole.

---

2. By this opinion, we do not wish to imply that every defendant who enters a guilty plea and fails a subsequent therapeutic polygraph will automatically be violated. A hearing will still have to take place at which the sentencing judge will be able to inquire about the purpose of the polygraph and the questions asked during the process. As always, the sentencing judge will have full discretion to determine whether and for how long parole can be violated.

3. Henceforth, the Commonwealth should be on notice that we will not require a sex offender who pleads nolo contendere to submit to therapy or polygraphs that address details of the underlying crime.

## III. CONCLUSION

To use the analogy with which we began this opinion, we rule today that the Commonwealth must lose its "battle" to revoke Jafet Camacho-Vasquez' parole. However, the essence of our decision enables the Commonwealth to win the "war" over the use of therapeutic polygraphs as a tool in the monitoring and treatment of almost all sex offenders. So long as the Commonwealth and the defendant do not enter into a nolo contendere plea agreement, therapeutic polygraphs may be employed as a therapeutic tool during sex offender treatment. In this case, only the defendant's negotiated nolo contendere plea will save him from reincarceration. An order consistent with the above will be entered this date.

## ORDER

And now, January 29, 2007, upon consideration of the parties' arguments, the order of this court is as follows:

(1) Defendant's challenge to the use of therapeutic polygraph examinations is denied.

(2) The Commonwealth's motion to revoke defendant's parole is also denied.